The TORRINGTON COMPANY,
Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–
Appellee,

v.

KOYO SEIKO CO., LTD. and Koyo
Corporation of U.S.A., Defen-
dants/Cross–Appellants,

v.

NTN BEARING CORPORATION OF
AMERICA, American NTN Bearing
Manufacturing Corporation and NTN
Corporation,

and

NSK Ltd. and NSK Corporation,
Defendants–Appellees.

Nos. 95–1210, 95–1211.

United States Court of Appeals,
Federal Circuit.

April 23, 1996.

James R. Cannon, Jr., Stewart & Stewart, Washington, DC, argued for plaintiff-appellant. With him on the brief were Terence P. Stewart and John M. Breen.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Department of Justice, Washington, DC, argued for defendant-appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel for Import Administration, Berniece A. Browne, Senior Counsel, Mark A. Barnett and Thomas H. Fine, Attorneys–Advisor, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel. Of counsel was David J. Ross, Kazumune V. Kano, Barnes, Richardson & Colburn, Chicago, Illinois, argued for defendants-appellees. Donald J. Unger, Barnes, Richardson & Colburn, Chicago, Illinois, was on the brief for defendants-appellees. Of counsel were Cindy H. Chan and Jesse M. Gerson.

Neil R. Ellis, Powell, Goldstein, Frazer & Murphy, Washington, DC, argued for defendants/cross-appellants. With him on the brief were Peter O. Suchman and Susan M. Matthews.

Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson, Lipstein, Jaffee & Lawson, Washington, DC, were on the brief for defendants-appellees.

Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

This case arises under the antidumping laws. It presents us with three issues. The first issue is whether the Department of Commerce ("Commerce") may lawfully not assess antidumping duties upon merchandise which is imported into the United States by a company related to the foreign manufacturer and which then is exported to a third country, when no sale of the merchandise takes place in the United States. The second issue is whether Commerce may lawfully reduce the potential antidumping duty on merchandise imported into the United States by taking into account pre-sale transportation expenses associated with the sale of like merchandise in the manufacturers' home market as an exporter's sales price ("ESP") offset. The third issue is whether, when computing an antidumping duty, Commerce, under the ESP offset regulation, may lawfully adjust the foreign market value of merchandise for certain post-sale price adjustments ("PSPAs") as indirect selling expenses.

The Torrington Company ("Torrington") and Koyo Seiko Co., Ltd. ("Koyo Seiko") and Koyo Corporation of U.S.A. ("Koyo USA") (together, "Koyo"), appeal and cross-appeal, respectively, parts of the final judgment of the United States Court of International Trade in *Torrington Co. v. United States*, 818 F.Supp. 1563 (Ct. Int'l Trade 1993), and *Federal–Mogul Corp. v. United States*, 871 F.Supp. 443 (Ct. Int'l Trade 1994). In these two decisions, the court decided the lawfulness of various aspects of the final results of Commerce's review of the antidumping order in effect for antifriction bearings. Those final results are set forth in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Final Results of Antidumping Duty Administrative Reviews*, 56 Fed.Reg. 31,754 (July 11, 1991)

("*Final Results I*"), and in the issues appendix to *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review*, 56 Fed.Reg. 31,692 (July 11, 1991) ("*Final Results II*").

Torrington, a United States producer of antifriction bearings, appeals the Court of International Trade's affirmance of Commerce's decision not to assess antidumping duties upon certain antifriction bearings imported from Japan into the United States by the American Koyo Corp. ("American Koyo"), which is not a party to this litigation, and by Koyo USA. Both are American subsidiaries of Koyo Seiko, the manufacturer of the bearings. The bearings at issue were not sold in the United States, but were exported from this country by American Koyo and Koyo USA. Torrington also appeals the Court of International Trade's affirmance of Commerce's adjustment of the foreign market value of antifriction bearings manufactured in Japan by NTN Corporation ("NTN") and imported into the United States by NTN Bearing Corporation of America and American NTN Bearing Manufacturing Corporation. Commerce made this adjustment by taking into account pre-sale transportation expenses associated with the sale of like merchandise in NTN's home markets as an ESP offset. Torrington also appeals the court's affirmance of a similar ruling by Commerce with respect to antifriction bearings imported by affiliates of the Japanese manufacturers NSK, Ltd. and NSK Corporation (collectively, "NSK"). Finally, Koyo cross-appeals the court's rejection of Commerce's decision to adjust the foreign market value of some of Koyo Seiko's antifriction bearings for certain PSPAs.

For the reasons set forth below, we hold that Commerce acted lawfully (1) in not assessing antidumping duties upon antifriction bearings exported by American Koyo and Koyo USA; and (2) in adjusting the foreign market value of NTN's and NSK's antifric-

tion bearings imported into the United States by taking into account, as an ESP offset, pre-sale transportation expenses associated with the sale of like merchandise in the manufacturers' home markets. We hold that Commerce acted unlawfully, though, in adjusting the foreign market value of Koyo Seiko's antifriction bearings for certain PSPAs. We therefore affirm the decisions of the Court of International Trade.

## BACKGROUND

### I.

The antidumping laws provide that Commerce must impose an additional duty on imported merchandise that is being sold, or is likely to be sold, in the United States at less than its fair value to the detriment of a domestic industry. *See* 19 U.S.C. § 1673(1)-(2) (1988).[1] This additional duty is known as the "dumping margin." *See* 19 C.F.R. § 353.2(f) (1994). The "dumping margin" is the amount by which the foreign market value[2] of the merchandise exceeds its United States price.[3] *See* 19 U.S.C. § 1673.

Commerce, acting through the United States International Trade Administration, determines what merchandise is subject to the antidumping laws and announces its decision in antidumping duty orders. An antidumping duty order is an order directing that duties equivalent to the dumping margin be assessed on merchandise described in the order whenever such merchandise is imported into the United States. *See* 19 U.S.C. § 1673(2). During the relevant period, the antifriction bearings at issue in this case were subject to an antidumping duty order.

### II.

Commerce initiated an administrative review of imports of antifriction bearings from Japan and other countries in 1990 for the period November 9, 1988, through April 30, 1990. *Antifriction Bearings (Other Than*

---

1. The antidumping laws have been altered by the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994) ("URAA"). This case is governed by the antidumping laws in place prior to the URAA.

2. 19 U.S.C. § 1677b (1988).

3. 19 U.S.C. § 1677a (1988).

*Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom; Initiation of Antidumping Administrative Reviews,* 55 Fed.Reg. 23,575 (June 11, 1990). Commerce published its preliminary determination in regard to antifriction bearings imported from Japan in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Antidumping Duty Administrative Reviews,* 56 Fed.Reg. 11,186 (March 15, 1991). Commerce published its final determination as to issues relating specifically to the importation of antifriction bearings from Japan in *Final Results I,* 56 Fed.Reg. 31,754, and its final determination as to general issues pertaining to the reviews of Japan and various other countries in the issues appendix of *Final Results II,* 56 Fed.Reg. at 31,692, 31,717, 31,743.

As noted above, three aspects of Commerce's computation of antidumping duties imposed upon antifriction bearings are at issue. The first aspect involves certain merchandise exported from the United States by American Koyo and Koyo USA. Due to the large volume of sales in the *Antifriction Bearings* proceeding, Commerce did not determine dumping margins for each Koyo entry, but instead used a sampling methodology to determine a representative dumping margin, or antidumping duty. The total antidumping duty due for all entries during the review period was calculated by imputing the representative dumping margin, or antidumping duty, to all of Koyo's entries during that period. In the process of making this calculation, however, Commerce allowed Koyo Seiko to not report information regarding antifriction bearings that were imported into the United States but then were exported by American Koyo and Koyo USA. *Final Results II,* 56 Fed.Reg. at 31,743. Commerce explained that it could not calculate dumping margins on such imports because, in the absence of sales in the United States, there was no basis for calculating the United States price of the bearings. *Id.* Thus, the exported antifriction bearings did not enter

into the calculation of the total antidumping duty due from Koyo.

The second aspect of the review at issue involves pre-sale home-market transportation expenses. In calculating NTN's and NSK's dumping margins, Commerce deducted pre-sale home-market transportation expenses from the calculation of foreign market value as an ESP offset. *Id.* at 31,715. This deduction resulted in a lowering of NTN's and NSK's dumping margins. Commerce explained that because it does not treat pre-sale and post-sale movement charges differently in calculating an ex-factory United States price (both of which are deducted), it must treat pre-sale home-market transportation expenses in a similar manner to ensure equitable price-to-price comparison. *Id.*

The third aspect of the review at issue involves PSPAs. In calculating the dumping margin on Koyo Seiko's antifriction bearings, Commerce adjusted its calculation of the foreign market value of the bearings to account for certain PSPAs. *Final Results II,* 56 Fed.Reg. at 31,717. Koyo Seiko designated two types of PSPAs: (1) those reflecting invoicing errors (both debits and credits); and (2) those reflecting retroactive price changes or other credits.

The first type of adjustment arises, for example, in the situation where an error is discovered in an amount previously billed or paid and, in response, Koyo Seiko issues a debit or credit note to the customer. This type of adjustment is specific as to the product, the number of units, and the unit price involved. However, although Koyo Seiko records these adjustments, it does not relate them to a given sale in its records (*i.e.,* the appropriate sales invoice is not matched with the appropriate price adjustment). Consequently, Koyo Seiko is unable, from its records, to report the original sale along with its price adjustment.

An example of the second type of adjustment is the situation in which Koyo Seiko and one of its customers do not complete negotiation of the sale price of the bearings for a particular time period before that time period begins. Rather than ceasing delivery until the completion of negotiations, Koyo

Seiko ships the merchandise to the customer and then, upon completion of negotiations, issues a retroactive debit or credit to the customer. Another example of Koyo Seiko's second type of adjustment is the situation in which Koyo Seiko grants a retroactive price reduction to a given customer on a specific product or products to meet competitive market forces. This type of adjustment is effected through the issuance of a credit note to the customer; the note may cover a variety of products and sales transactions. When making the adjustment, Koyo Seiko records only the customer name and the date and amount of the credit; it does not list the individual sales transactions or product types covered by the credit.

In reporting its PSPAs for the purposes of the administrative review, Koyo Seiko first determined the total net amount of PSPAs for each customer during the review period (credits minus debits). In making this determination, it included PSPAs for both merchandise within the scope of the antidumping order, or "in-scope merchandise" (the antifriction bearings), and merchandise not within the scope of the antidumping order, or "out-of-scope" merchandise (ball bearings and cylindrical roller bearings). This net amount then was divided by the total sales to that customer during the same period, including sales of both in-scope and out-of-scope merchandise. This division yielded a customer-specific PSPA "factor." This customer-specific factor then was multiplied by the reported unit price of each antifriction bearing sold to that customer. This calculation, in turn, yielded the amount of the PSPA to be made to each unit in the course of calculating foreign market value for each of Koyo Seiko's antifriction bearings imported into the United States.

Koyo Seiko states that it included data for out-of-scope merchandise in calculating its PSPAs for two reasons. First, some of its PSPAs are made without reference to particular merchandise or models sold. Second, even for the PSPAs calculated on a product-specific basis, Koyo Seiko does not maintain the data in its computerized data base on a product-specific basis. Koyo Seiko claims that, given the "staggering size" of its data

base, obtaining model-specific details would "be so impractical in any realistic timeframe as to be effectively impossible."

III.

Torrington and Federal–Mogul Corporation filed separate actions in the Court of International Trade challenging Commerce's determinations in *Final Results I* and *Final Results II.* The court consolidated the two actions and addressed each of the three aspects of the administrative review discussed above.

As to the first aspect, the court affirmed Commerce's decision not to impose antidumping duties on Koyo Seiko's antifriction bearings that were imported into the United States and then exported without any sale in this country. *Torrington,* 818 F.Supp. at 1573–74. The court reasoned that the antidumping statutes require some meaningful sale to, or in, the United States market in order to determine the dumping margin. *Id.* at 1574. The court determined that, in the absence of such sales, there was no basis for computing an antidumping duty. *Id.*

As to the second aspect, citing, *inter alia, Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 787 F.Supp. 208, 211–13 (Ct. Int'l Trade 1992) ("*Ad Hoc*"), the court initially held that Commerce's decision to deduct pre-sale home-market transportation expenses from the calculation of foreign market value in certain situations was reasonable, based upon Commerce's decision to compare United States price to foreign market value at a contemporaneous point in the chain of commerce. Subsequently, *Ad Hoc* was reversed by this court in *Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398 (Fed.Cir.) ("*Ad Hoc I*"), *cert. denied sub nom., Cemex, S.A. v. United States,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994). At Torrington's request, the Court of International Trade revised its initial finding and remanded the case to Commerce, in order to allow Commerce "to determine whether it has statutory authority to adjust [foreign market value], calculated using purchase price, for pre-sale inland freight in light of [*Ad Hoc*

*I* ]." On remand, Commerce decided that, in light of *Ad Hoc I,* it no longer could deduct home market charges from foreign market value pursuant to its inherent power to fill gaps in the antidumping statute. It determined, however, that it would continue to deduct from foreign market value pre-sale home-market transportation expenses as an ESP offset under 19 C.F.R. § 353.56 (1994). The court upheld Commerce's remand determination. *Federal–Mogul,* 871 F.Supp. at 446–47.

As to the third aspect, citing 19 U.S.C. § 1675(a)(2) (1988), the Court of International Trade held that merchandise which is outside the scope of an antidumping duty order cannot be used in the calculation of antidumping duties. *Torrington,* 818 F.Supp. at 1578. Based upon this holding, the court remanded and directed Commerce to "develop a methodology which removes PSPAs and rebates paid on sales of out of scope merchandise from any adjustments made to [foreign market value] for PSPAs or rebates or, if no viable method can be developed, to deny such an adjustment in its calculation of [foreign market value]." [4] *Id.* at 1579. On remand, since it was unable to develop such a methodology, Commerce denied the adjustment. The denial subsequently was sustained by the court. *Federal–Mogul Corp. v. United States,* 834 F.Supp. 1391, 1397–1400 (Ct. Int'l Trade 1993).

## DISCUSSION

### I.

■ We review a decision of the Court of International Trade affirming or reversing the final results of an administrative review *de novo.* That is, we "apply anew" the court's statutorily-mandated standard of review to the administrative review. *PPG Indus., Inc. v. United States,* 978 F.2d 1232, 1236 (Fed.Cir.1992). Accordingly, we must uphold the final results of the administrative review unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). No facts are in dispute in this case; the appeal presents only issues of statutory construction.

■ In our determination of the lawfulness of an agency's construction of a statute, we are guided by the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (*"Chevron"*). *Chevron* sets forth a two-step test to be used in evaluating the lawfulness of an agency's approach. The first question in the *Chevron* analysis is "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781.

If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnote omitted). Any reasonable construction of the statute is a permissible construction. "[A]n agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1570 (Fed.Cir.1994) (citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978)). The court will defer to the agency's construction of the statute as a permissible construction if it "reflects a plausible construction of the plain language of the statute[s] and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991). Using the *Chevron* approach, we will consider each of the three aspects of the administrative review that is at issue.

### II.

A determination of the lawfulness of Commerce's decision not to assess antidumping

---

4. Koyo has not appealed the rebate aspect of the

Court of International Trade's judgment.

duties on the antifriction bearings exported from the United States by American Koyo and Koyo USA requires consideration of the applicable statutes. 19 U.S.C. § 1673(2) provides that once merchandise is subject to an antidumping order "then there shall be imposed upon such merchandise an antidumping duty ... in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise." 19 U.S.C. § 1675(a)(2) provides that, in computing the amount of the antidumping duty, Commerce

shall determine—

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

Torrington argues that Commerce violated the mandate of these provisions by allowing American Koyo and Koyo USA to import into the United States antifriction bearings covered by the antidumping order which subsequently were exported without payment of an antidumping duty.

Both § 1673(2) and § 1675(a)(2) call for the determination of the "United States price." " 'United States price' means the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate." 19 U.S.C. § 1677a(a) (1988). " '[P]urchase price' means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise...." *Id.* § 1677a(b).[5] " '[E]xporter's sales price' means the price at which merchandise is sold or agreed to be sold in the United States...." *Id.* § 1677a(c).[6]

Koyo and Commerce assert that, since no sale of, or agreement to sell, the exported merchandise occurred in the United States, there was no United States price. Because there was no United States price, they argue, no antidumping duty due could be calculated for the merchandise. Accordingly, they maintain that Commerce acted lawfully in interpreting the antidumping laws as not requiring the assessment of an antidumping duty upon Koyo Seiko's exported antifriction bearings.

Torrington does not argue that a United States price could be calculated. Rather, it contends that § 1675(a)(2)'s "shall" and "each entry" language means that Commerce must calculate a dumping margin on each occasion that merchandise subject to an antidumping order enters the United States, regardless of whether a United States price can be calculated.

As the first step in reviewing Commerce's construction of the statute, we must determine "whether Congress has directly spoken to the precise question" of whether antidumping duties must be imposed on entries of merchandise which (i) are covered by an antidumping order; (ii) are imported by an affiliate of the foreign manufacturer, and (iii) then are exported from the United States without sale in this country, the result being that no United States price can be calculated for the merchandise. *See Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781.

The language of § 1675(a)(2) is straightforward. Part (A) of the provision requires the determination of X and Y (X being the foreign market value and Y being the United States price), while part (B) requires the determination of the amount, if any, by which X is greater than Y. The statute gives no explicit indication of what to do if Y (the United States price) cannot be determined, however.

Torrington asserts, though, that Commerce can use alternatives to United States price in calculating an antidumping duty. Again relying on § 1675(a)(2)'s "shall" and

---

**5.** Since the bearings that were subject to the antidumping order were imported into the United States through Koyo Seiko affiliates American Koyo and Koyo USA, purchase price, as defined in 19 U.S.C. § 1677a(b), is not at issue in this case.

**6.** Both purchase price and exporter's sales price are subject to various adjustments. 19 U.S.C. § 1677a(d), (e). These adjustments are not at issue in this part of the appeal.

"each entry" language, it contends that Commerce must use an alternative approach. Yet, Torrington is unable to point to statutory language that explicitly requires Commerce to use an alternative to the United States price. It is true that, under 19 U.S.C. § 1677e(c) (1988), in some instances Commerce must use the "best information otherwise available" to calculate the antidumping duty. The plain language of § 1677e(c), however, limits such instances to three situations: (1) "a party or any other person refuses . . . to produce information requested in a timely manner"; (2) "a party or any other person . . . is unable to produce information requested in a timely manner"; or (3) "a party or any other person . . . otherwise significantly impedes an investigation." None of these three circumstances are alleged in this case.

Torrington also claims that Commerce's action directly conflicts with the drawback laws. 19 U.S.C. § 1313(a) (1988) provides that "[u]pon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties." In 1988, Congress amended the drawback laws to eliminate the drawback of antidumping duties. Thus, Congress enacted 19 U.S.C. § 1677h (1988), which provides that "[f]or purposes of any law relating to the drawback of customs duties . . . antidumping duties . . . shall not be treated as being regular customs duties." Torrington asserts that Congress, through § 1677h, sought to ensure that exportation from the United States would not result in the return of antidumping duties already paid. Torrington contends that Commerce's action in this case allows the return of antidumping duties already paid—presumably in the form of entry deposits—and thus runs afoul of § 1677h.

We reject Torrington's argument on this point. The drawback provisions do not directly address the determination of whether an antidumping duty is due on exported merchandise. Section 1313 speaks to a situation ("the exportation of articles manufactured or produced in the United States with the use of imported merchandise") different from the one before us (the importation and then exportation of particular articles of merchandise with no sale in the United States). Significantly, while Torrington is correct that Congress sought to end drawback for antidumping duties with the 1988 amendment to the drawback laws, the 1988 amendment was aimed at United States parties that *buy* dumped merchandise. The House Report to the predecessor bill that amended the antidumping laws to add § 1677h explains that "[i]f U.S. parties are allowed to buy dumped and subsidized goods at dumped and subsidized prices (which is essentially what the current drawback provisions allow) then dumping and subsidization will continue." H.R.Rep. No. 40 (Part 1), 100th Cong., 1st Sess. 141 (1987). In this case, there was no purchase by "U.S. parties."

■ For the foregoing reasons, we cannot conclude that Congress has "directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. Therefore, we must defer to Commerce's method of applying the antidumping laws to exempt the merchandise at issue here from antidumping duties if that method is based on a reasonable construction of the pertinent statutes. *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782; *Koyo Seiko*, 36 F.3d at 1570.

In *Final Results II*, Commerce explained the construction of the antidumping laws upon which its methodology is based:

Section 731 [7] of the Act directs the Department to impose antidumping duties on imported merchandise "in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise." Section 751 [8] of the Act further provides that the Department's administrative review of an antidumping duty order or finding will determine the amount of any antidumping duties and that "that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination * * *." The Depart-

---

**7.** 19 U.S.C. § 1673.

**8.** 19 U.S.C. § 1675.

ment's determination of any antidumping duties must be in accordance with section 772 [9] of the Act, [which defines United States price]. . . .

[The United States price is not calculable.]

Accordingly, . . . [there is] no basis for determining any antidumping duties.

Section 779 [10] of the Act, which prohibits drawback of antidumping duties, does not affect our determination of the amount of antidumping duties in accordance with section 751 and 772 of the Act, nor the proper collection or refund of the difference between the duties determined and the estimated antidumping duties deposited on entry of the merchandise into the United States. The refund of deposits of estimated antidumping duties, when greater than the amount of antidumping duties determined in accordance with section 751, is not a drawback of antidumping duties. Such refunds are merely a mechanism to conform the assessment of antidumping duties to the determination of the Department in its administrative review, as required by section 751 of the Act.

*Final Results II*, 56 Fed.Reg. at 31,743 (citations omitted).

Torrington argues that Commerce's interpretation is unreasonable in light of the "language and spirit" of the antidumping laws. Torrington asserts that the statutory requirements that antidumping duties be assessed on each "entry" and that no "drawback" of antidumping duties be permitted upon exportation indicate Congress's intent that antidumping duties be imposed on *all* imports that are subject to an antidumping order.

We conclude, however, that Commerce's construction is a reasonable one. Congress expressly mandated that United States price be used in calculating antidumping duties, and expressly defined United States price. Under these circumstances, Commerce's determination that under the antidumping laws the assessment of antidumping duties must be in accordance with the provision defining

United States price is rational. More broadly, an antidumping duty is required when "foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value" and other conditions not at issue in this case are met. 19 U.S.C. § 1673. In view of the fact that the antifriction bearings which American Koyo and Koyo USA exported were neither sold in the United States nor likely to be sold in the United States, Commerce's decision not to impose an antidumping duty on them was consistent with the basic purpose of the antidumping laws and therefore was reasonable.

In sum, Commerce's interpretation "reflects a plausible construction of the plain language of the [antidumping laws] and does not otherwise conflict with Congress' express intent." *Rust*, 500 U.S. at 184, 111 S.Ct. at 1767. Therefore, we uphold the decision of the Court of International Trade on this issue.

### III.

■ Before oral argument in this case, the question of whether Commerce may adjust the foreign market value of merchandise imported into the United States by taking into account pre-sale transportation expenses associated with the sale of like goods in the manufacturer's home markets was answered by this court in *Torrington Co. v. United States*, 68 F.3d 1347 (Fed.Cir.1995). In *Torrington*, we held that "Commerce may deduct indirect selling expenses, including indirect transportation expenses, from foreign market value under the ESP offset." *Id.* at 1356. The Court of International Trade's ruling on this issue in this case is in conformity with our holding in *Torrington*. Accordingly, we will not disturb it.

### IV.

Finally, we turn to the PSPA issue. In adjusting the foreign market value of Koyo Seiko's antifriction bearings for PSPAs, Commerce stated as follows:

The adjustments claimed by Koyo are allowable because they are customary and

**9.** 19 U.S.C. § 1677a.

**10.** 19 U.S.C. § 1677h.

an ordinary part of its business practices. Koyo determines these adjustments on a product-specific basis but aggregates them for bookkeeping purposes. Because they were allocated [in Koyo's bookkeeping system] on neither a product-specific nor a customer-specific basis, we treated them as indirect selling expenses.

*Final Results II,* 56 Fed.Reg. at 31,717.

On appeal, Commerce does not take a position on the PSPA issue. We note, though, that before the Court of International Trade it did advance an explanation for the adjustment. Prior to the court's remand, Commerce stated

that given the enormous number of sales transactions involved in this administrative review and the fact that the vast majority of them involved PSPAs or rebates, coupled with the fact that PSPAs and rebates were not always recorded on a product-specific basis, the methodology proposed by the respondents and accepted by [Commerce] to calculate an average PSPA or rebate per customer and apply that average to sales of the subject merchandise was reasonable.

*Torrington,* 818 F.Supp. at 1577–78.

Koyo asserts that the Court of International Trade erred in rejecting Commerce's acceptance of the PSPA adjustment to the foreign market value of Koyo Seiko's antifriction bearings that was proposed by Koyo. As noted above, the court rejected the adjustment because it concluded that Commerce had acted unlawfully in allowing the PSPAs to be calculated using out-of-scope merchandise. *Torrington,* 818 F.Supp. at 1578–79.

As the first step in reviewing Commerce's action, we must determine "whether Congress has directly spoken to the precise question" of whether Commerce may adjust foreign market value for the kind of PSPAs made by Koyo Seiko. *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. Torrington recognizes that the statute upon which the Court of International Trade relied in making its ruling, 19 U.S.C. § 1675(a)(2), does not specifically address the precise question at issue. In addition, neither Torrington nor Koyo points to any other statutory provision that directly speaks to the issue.

Because Congress has not spoken to the precise question at issue, we will defer to Commerce's adjustment of foreign market value for Koyo Seiko's PSPAs if the adjustment is based upon a reasonable construction of the pertinent statutes. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781; *Koyo Seiko,* 36 F.3d at 1570. Thus, we must determine if Commerce's approach "reflects a plausible construction of the plain language of the statute[s] and does not otherwise conflict with Congress' express intent." *Rust,* 500 U.S. at 184, 111 S.Ct. at 1767.

In calculating the antidumping duty due, Commerce must determine "the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination." 19 U.S.C. § 1675(a)(2). 19 U.S.C. § 1677b governs Commerce's determination of foreign market value. It provides that the foreign market value of imported merchandise is generally "the price ... at which such or similar merchandise is sold ... in the principal markets of the country from which exported" plus all costs incident to readying the merchandise for shipment to the United States. 19 U.S.C. § 1677b(a)(1). When, as here, there is a significant volume of sales or a significant number of price adjustments, Commerce may use "averaging or generally recognized sampling techniques" in determining foreign market value and United States price. 19 U.S.C. § 1677f–1(a) (1988).

19 U.S.C. § 1677b(a)(4) provides that, when foreign market value is being compared with United States price, foreign market value may be adjusted in three circumstances, provided that such circumstances are established to the satisfaction of Commerce. *See Sharp Corp. v. United States,* 63 F.3d 1092, 1094 (Fed.Cir.1995). Commerce may consider: (1) differences between quantities sold in the foreign and domestic markets; (2) differences in the circumstances of sales; and (3) differences in physical characteristics of the products. *Id.*

A fourth type of adjustment to foreign market value is the ESP offset. The ESP offset is not set forth in § 1677b. It was

"created by Commerce, and approved by the courts, as a means to effect a fair comparison between [foreign market value] and [United States price]." *Sharp,* 63 F.3d at 1095. "Because the [foreign market value] allowance under § 1677b(a)(4)(B) for circumstances connected to the sale includes only direct selling expenses, while the statutory adjustment to [exporter's sales price] under § 1677a(e)(2) encompasses both direct and indirect selling expenses, Commerce was concerned that it would be unfair to compare [foreign market value] to [United States price] based on [exporter's sales price]." *Id.*[11] The ESP offset thus provides that when, as here, the United States price is calculated using the exporter's sale price, Commerce may reduce the foreign market value by the amount of indirect selling expenses incurred in making foreign sales. *See id.*[12] We understand Commerce to have adjusted the foreign market value of Koyo Seiko's antifriction bearings using an ESP offset rationale.[13]

The regulation governing the ESP offset provides as follows:

> In comparisons with exporter's sales price, the Secretary will make a reasonable deduction from foreign market value for all expenses, other than those described in paragraph (a)(1) or (a)(2), incurred in selling such or similar merchandise up to the

amount of the expenses, other than those described in paragraph (a)(1) or (a)(2), incurred in selling the merchandise.

19 C.F.R. § 353.56(b)(2).[14] We have held that this regulation is "a proper and reasonable exercise of the Secretary's authority to administer the statute fairly." *Smith–Corona Group v. United States,* 713 F.2d 1568, 1579, 1 Fed. Cir. (T) 130, 141 (Fed.Cir.1983) (examining a previous version of the regulation), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Thus, the regulation passes *Chevron* muster.

■ Commerce, like other agencies, must follow its own regulations. *See Fort Stewart Schools v. Federal Labor Relations Auth.,* 495 U.S. 641, 654, 110 S.Ct. 2043, 2051, 109 L.Ed.2d 659 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); *Saddler v. Department of the Army,* 68 F.3d 1357, 1358 (Fed. Cir.1995) (agency "must abide by its own regulation"). We thus must determine whether Commerce acted in conformity with its regulation in adjusting the foreign market value of imported antifriction bearings to take into account Koyo Seiko's PSPAs.

Koyo asserts that Koyo Seiko's methodology for calculating the PSPA adjustment to foreign market value conforms to the letter and spirit of 19 C.F.R. § 353.56(b)(2), and that Commerce's original allowance of the

**11.** Section 1677a(e)(2) states, in pertinent part, that "the exporter's sales price shall ... be adjusted by being reduced by the amount, if any, of ... expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." 19 U.S.C. § 1677a(e)(2).

**12.** The amount of reduction is capped at the amount of indirect selling expenses incurred on sales in the United States. *Sharp,* 63 F.3d at 1095. This cap is known as the "ESP offset cap." *Id.*

**13.** Commerce stated that, in adjusting the foreign market value of Koyo Seiko's antifriction bearings, it treated Koyo Seiko's PSPAs as indirect selling expenses. *Final Results II,* 56 Fed. Reg. at 31,717. The only means by which foreign market value may be adjusted for indirect selling expenses that the parties cite, or of which the court is aware, is the ESP offset provision.

**14.** Paragraphs (a)(1) and (a)(2) of 19 C.F.R. § 353.56 provide:

> (1) In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. In general, the Secretary will limit allowance to those circumstances which bear a direct relationship to the sales compared.
> (2) Differences in circumstances of sale for which the Secretary will make reasonable allowances normally are those involving differences in commissions, credit terms, guarantees, warranties, technical assistance, and servicing. The Secretary also will make reasonable allowances for differences in selling costs (such as advertising) incurred by the producer or reseller but normally only to the extent that such costs are assumed by the producer or reseller on behalf of the purchaser from that producer or reseller.

19 C.F.R. § 353.56(a).

PSPAs as indirect selling expenses was reasonable. For its part, Torrington recognizes that Commerce has the authority to deduct "indirect selling expenses" from foreign market value under 19 C.F.R. § 353.56(b)(2). It contends, though, that Commerce should not be allowed to designate Koyo Seiko's PSPAs as indirect selling expenses. Torrington argues that Koyo Seiko's PSPAs did not qualify for deduction under the regulation because they were not indirect selling expenses.

■ An agency's interpretation of its own regulation is entitled to deference. *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991). Accordingly, the agency's interpretation will be upheld " 'unless it is plainly erroneous or inconsistent with the regulation.' " *Immigration & Naturalization Serv. v. Stanisic,* 395 U.S. 62, 71, 89 S.Ct. 1519, 1525, 23 L.Ed.2d 101 (1969) (citation omitted); *see also Sharp,* 63 F.3d at 1095; *Mast Indus., Inc. v. United States,* 822 F.2d 1069, 1073, 5 Fed. Cir. (T) 105, 109 (Fed.Cir.1987). Thus, the question to be determined is whether Commerce's treatment of Koyo Seiko's PSPAs as expenses that are not "those described in paragraph (a)(1) or (a)(2)" of 19 C.F.R. § 353.56 is plainly erroneous or inconsistent with 19 C.F.R. § 353.56.

"The expenses 'described in paragraph (a)(1) or (a)(2)' are direct selling expenses." *Sharp,* 63 F.3d at 1096. Thus, under the regulation, direct selling expenses are not eligible for ESP offset treatment. *See* 19 C.F.R. § 353.56(b)(2).

■ We have explained that direct selling expenses "are 'expenses which vary with the quantity sold,' " *Zenith Elecs. Corp. v. United States,* 77 F.3d 426, 431 (Fed.Cir.1996) (citations omitted), or that are "related to a particular sale," *Torrington,* 68 F.3d at 1353. We also have explained that indirect selling expenses " 'are those that do not vary with

the quantity sold,' " *Zenith Elecs.,* 77 F.3d at 431 (citations omitted), or that are "not related to a particular sale," *Torrington,* 68 F.3d at 1353. Neither Koyo nor Torrington argue contrary definitions. Accordingly, whether Koyo Seiko's PSPAs qualified for ESP offset treatment turns on whether they were direct or indirect selling expenses, as those expenses are defined in *Zenith Electronics* and *Torrington.*

In adjusting the foreign market value of Koyo Seiko's antifriction bearings for Koyo Seiko's PSPAs, Commerce reasoned that the PSPAs "were allocated on neither a product-specific nor a customer-specific basis." *Final Results II,* 56 Fed.Reg. at 31,717. Koyo states that Commerce was in error in asserting that Koyo Seiko does not allocate its PSPAs on a customer-specific basis, but contends that Commerce reached the correct end result in allowing adjustments for these expenses. Koyo asserts that the PSPAs were allocated in such a way that Commerce's adjustment of the foreign market value for them was reasonable.

■ Koyo Seiko's *recordation* and *allocation* of PSPAs must be distinguished from its *calculation* of PSPAs, however. The two kinds of PSPAs described in the BACKGROUND section of this opinion (those reflecting invoicing errors and those reflecting retroactive price changes or credits) are calculated on a product-specific basis. Both kinds of PSPA involve adjustments to the price of a product, or group of products, made in response to billing errors for a particular customer or in response to the post-sale raising or lowering of the price for a particular customer. These PSPAs thus represent expenses [15] related to a particular sale, or sales, and they vary with the quantity of the particular item sold. In short, the PSPAs at issue constitute direct selling expenses, as such expenses are defined in *Zenith Electronics* and *Torrington.* [16]

---

**15.** No party has argued that Koyo Seiko's PSPAs are not properly considered expenses; thus we assume that Koyo Seiko's PSPAs are properly considered as such.

**16.** In earlier litigation, Koyo Seiko challenged Commerce's treatment of its PSPAs as indirect selling expenses. *Koyo Seiko Co. v. United States,*

796 F.Supp. 1526 (Ct. Int'l Trade 1992). In *Koyo Seiko,* Koyo Seiko sought to have its PSPAs treated as direct expenses. *Id.* at 1530. Commerce argued that the PSPAs were "indirect expenses because Koyo did not allocate these adjustments on a product-specific basis." *Id.* The Court of International Trade held that Koyo

Koyo explains that the PSPAs were reported to Commerce on a customer-specific basis because data is not recorded and maintained in Koyo Seiko's computerized records on a product-specific basis. Koyo states that Koyo Seiko does not record information in such a manner because it is unnecessary to do so in the normal course of business. Koyo further explains that obtaining product-specific information from Koyo Seiko's database at this point would be "so impractical in any realistic timeframe as to be effectively impossible."

Thus Koyo seeks to have expenses that are direct selling expenses treated as indirect selling expenses—and thereby obtain the benefit of the ESP offset regulation. Koyo seeks to do this because Koyo Seiko does not maintain its database in such a way as to be able to easily report the product-specific information that might allow Commerce to account for Koyo Seiko's PSPAs as direct selling expenses.[17] The allocation of expenses in a manner different from the calculation of the expenses, however, does not alter the relationship between the expenses and the sales under consideration. *See Smith–Corona*, 713 F.2d at 1580, 1 Fed. Cir. (T) at 143 (allocation method based on customer-specific rebates did "not deprive the[ ] rebates of their direct relationship to the sales under

consideration"). Nor does the failure to keep sufficient records of the expenses alter the relationship.

In sum, the regulation at issue, 19 C.F.R. § 353.56(b)(2), provides for "a deduction from [foreign market value] for all selling expenses *except direct selling expenses.*" *Sharp*, 63 F.3d at 1096 (emphasis added). In seeking a deduction from foreign market value for its PSPAs, Koyo is seeking, as an ESP offset, a deduction from foreign market value for direct selling expenses. Commerce's allowance of such a deduction was inconsistent with 19 C.F.R. § 353.56(b)(2).[18] Therefore, we affirm the Court of International Trade's rejection of Commerce's adjustment of the foreign market value of Koyo Seiko's antifriction bearings for Koyo Seiko's PSPAs.[19]

## CONCLUSION

For the foregoing reasons, the two decisions of the Court of International Trade that are on appeal are affirmed.

Each party shall bear its own costs.

AFFIRMED.

Seiko's PSPAs could not be specifically correlated with merchandise using verified cost and sales information "and thus, Commerce was justified in treating the adjustments as indirect expenses." *Id.* (citing *Smith–Corona*, 713 F.2d at 1568). The court later vacated a different aspect of its decision and dismissed the case. *Koyo Seiko Co. v. United States*, 806 F.Supp. 1008 (Ct. Int'l Trade 1992). The decision in *Koyo Seiko* was not appealed.

**17.** If Commerce would have been able to account for Koyo Seiko's PSPAs as direct selling expenses, the result might have been that Commerce would have adjusted the foreign market value of Koyo Seiko's antifriction bearings for Koyo Seiko's PSPAs as direct selling expenses under the circumstances-of-sales provision of 19 C.F.R. § 353.56(a).

**18.** Torrington and Koyo both assert that our decision in *Smith–Corona* compels a ruling in their favor. It is true that the formula which Commerce accepted for calculating the adjustment to foreign market value for Koyo's PSPAs is similar to the one approved in *Smith–Corona*, in that both formulas include adjustments made to out-

of-scope merchandise in calculating the foreign market value of in-scope merchandise. *See Smith–Corona*, 713 F.2d at 1579–80, 1 Fed. Cir. (T) at 142.

*Smith–Corona* does not control this case. There are distinct differences between the case at bar and *Smith–Corona*. Deductions in foreign market value due to differences in circumstances of sale are made under 19 C.F.R. § 353.56(a) and are limited to direct expenses. *Zenith Elecs.*, 77 F.3d at 431–32. The adjustments to foreign market value in *Smith–Corona* were made as circumstances of sales adjustments directly related to the sales under consideration. *Smith–Corona*, 713 F.2d at 1580, 1 Fed. Cir. (T) at 142–43. The adjustments to foreign market value in the present case were not made as circumstances of sales adjustments, but as indirect selling expenses.

**19.** As noted above, the Court of International Trade rejected Commerce's action in this regard because Koyo Seiko calculated its PSPAs using data for both in-scope and out-of-scope merchandise. *Torrington*, 818 F.Supp. at 1578–79. We thus decide the issue on a different ground.