**THE TIMKEN COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., Defendant–Intervenors.**

**Slip Op. 98–92.**
**Court No. 97–04–00562.**

United States Court of
International Trade.

July 2, 1998.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., William A. Fennell and Patrick J. McDonough), Washington, DC, for Plaintiff.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Lucius B. Lau ); of counsel: Carlos A. Garcia, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for Defendant.

Powell, Goldstein, Frazer & Murphy LLP (Peter O. Suchman, Neil R. Ellis, Elizabeth C. Hafner and Ronald E. Minsk ), Washington, DC, for Defendant–Intervenors.

## *OPINION*

TSOUCALAS, Senior Judge:

Plaintiff, The Timken Company ("Timken"), moves for judgment on the agency record pursuant to Rule 56.2 of the Rules of this Court. Timken challenges the Department of Commerce, International Trade Administration's ("Commerce") final results of the administrative review, entitled *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Reviews and Termination in Part ("Final Results"*), 62 Fed. Reg. 11,825 (Mar. 13, 1997).

### *Background*

The administrative review at issue encompasses imports of tapered roller bearings ("TRBs") during the review period of October 1, 1994 through September 30, 1995. On November 6, 1996, Commerce published the preliminary results of the instant review. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews ("Preliminary Results"*), 61 Fed.Reg. 57,391. On March 13, 1997, Commerce published the Final Results at issue. *See* 62 Fed.Reg. 11,825.

Timken claims Commerce erred in the Final Results by: (1) granting Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo") a downward adjustment to U.S. indirect selling expenses for imputed interest expenses incurred in financing antidumping duty cash deposits; (2) failing to adjust U.S. prices for export selling expenses; (3) allowing a direct adjustment to normal value ("NV") for Koyo's home market billing adjustments and rebates; and (4) making several clerical errors. Oral argument was held at the Court on June 24, 1998.

### *Discussion*

The Court has jurisdiction over this matter under 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or other-

wise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir. 1990).

Because the administrative review at issue was initiated after January 1, 1995, the applicable statutory provisions are the amendments made by the Uruguay Round Agreements Act ("URAA"), Pub.L. 103–465, 108 Stat. 4809.

1. *Offset to U.S. Selling Expenses for Imputed Interest on Cash Deposit of Estimated Dumping Duties*

■ Commerce accepted Koyo's offset to U.S. indirect selling expenses for imputed interest payments on cash deposits of estimated dumping duties in this review. *Final Results*, 62 Fed.Reg. at 11,828. Timken claims that Commerce's most recent position is to deny the offset, indicating that Commerce has changed its stance on this issue and necessitating a remand to deny the adjustment to U.S. indirect selling expenses. Timken's Mem. Supp. Mot. J. Agency R. at 17–19.

Commerce responds that, despite its current position to deny the offset, its decision to grant the offset in this case was within Commerce's discretion. Def.'s Partial Opp'n to Mot. J. Agency R. at 15–18. Koyo agrees generally with the stance taken by Commerce, emphasizing that the Court has a well-established position against retroactively applying changes in policy to reviews that have already been completed. Koyo's Opp'n to Mot. J. Agency R. at 6–10.

Commerce has waffled considerably in deciding how to deal with imputed interest payments on cash deposit, first granting then denying, followed by once again granting and, most recently, denying adjustments to U.S. indirect selling expenses. *See, e.g., Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order*, 58 Fed.Reg. 39,729, 39,749 (July 26, 1993) (granting the offset in 1991–92 AFB Review); *Final Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan*, 58 Fed.Reg. 64,720, 64,726 (Dec. 9, 1993) (granting the adjustment in the 1990–92 TRB Review); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders*, 60 Fed.Reg. 10,900, 10,918 (Feb. 28, 1995) (denying the offset in the 1992–93 AFB Review); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Finding* ("*1992–93 TRB Final Results*"), 61 Fed.Reg. 57,629, 57,638 (Nov. 7, 1996) (denying the offset in the 1992–93 TRB Review); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 Fed.Reg. 66,472, 66,488–89 (Dec. 17, 1996) (granting the offset in the 1993–94 AFB Review); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews*, 62 Fed.Reg. 2081, 2104–05 (Jan. 15, 1997) (granting the offset in the 1994–95 AFB Review); *Tapered*

*Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Reviews,* 63 Fed.Reg. 2558, 2571 (Jan. 15, 1998) (denying the offset in the 1995–96 TRB Review). Nevertheless, this Court has consistently upheld the adjustment when Commerce has granted it in the final results and remanded for Commerce to allow the adjustment when Commerce has denied it in the final results. *See Timken Co. v. United States,* 21 CIT ——, ——, 989 F.Supp. 234, 250 (1997), *modified,* 22 CIT ——, Slip Op. 98–20, 1 F.Supp.2d 1390 (Mar. 4, 1998) (remanding for Commerce to grant the adjustment in the 1992–93 TRB Review); *NSK Ltd. v. United States,* 21 CIT ——, ——, 969 F.Supp. 34, 55 (1997), *amended,* 21 CIT ——, Slip Op. 97–154, 1997 WL 728277 (Nov. 20, 1997) (remanding for Commerce to grant the adjustment in the 1992–93 AFB Review); *Federal–Mogul Corp. v. United States,* 20 CIT ——, ——, 950 F.Supp. 1179, 1183 (1996), *amended,* 21 CIT ——, Slip Op. 97–9, 951 F.Supp. 1026 (Jan. 22, 1997) (upholding Commerce's decision to grant the adjustment in the 1991–92 AFB Review).

Consequently, in accordance with this Court's consistent position, Commerce's decision to grant Koyo's offset to U.S. indirect selling expenses for imputed interest payments incurred in financing antidumping duty cash deposits is supported by substantial evidence and fully in accordance with law.

2. *Limiting U.S. Indirect Selling Expenses to Those Specifically Associated With Commercial Activity in the United States*

The pre-URAA statute provided for the reduction of exporter's sales price ("ESP") by the amount of "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." 19 U.S.C. § 1677a(e)(2) (1988). Although the statute was silent as to whether indirect selling expenses incurred *outside* the United States should be categorized as U.S. indirect selling expenses, Commerce chose to adjust U.S. price for such expenses. *See* 19 C.F.R. § 353.41(e)(2) (1994); ITA Antidumping Manual, Ch.7, at 11 (rev. ed. July 1993).

As revised by the URAA, the statute states that constructed export price ("CEP"), the post-URAA equivalent to ESP, is to be reduced by the amount of any "expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States" including "any selling expenses not deducted under subparagraph (A) [commissions], (B) [direct selling expenses], or (C) [selling expenses assumed by the seller on behalf of the purchaser]." 19 U.S.C. § 1677a(d)(1) & (d)(1)(D) (1994). In the Final Results, Commerce revised its previous practice and limited Koyo's U.S. indirect selling expenses to those expenses specifically associated with commercial activity in the United States. 62 Fed.Reg. at 11,834.

Timken claims that the new statutory language and the *Uruguay Round Agreements Act, Statement of Administrative Action* ("*SAA*"), at 153, H.R. Doc. 316, 103d Cong., 2d Sess., at 823 (1994), indicate that Congress intended for Commerce to continue the practice of including in U.S. indirect selling expenses the home market selling expenses attributable to export sales. Timken's Mem. Supp. Mot. J. Agency R. at 20–23. Timken further argues that Commerce's new practice improperly prevents CEP from being an ex-factory price and hinders a fair comparison because normal values are adjusted for indirect selling expenses up to the amount of U.S. indirect selling expenses when compared to CEP. *Id.* at 22–23 (citing *Agreement on Implementation of Article VI of the Generalized Agreement on Tariffs and Trade 1994,* at 147, H.R. Doc. No. 316, 103d Cong., 2d Sess., at 1455 (1994)). At oral argument, Timken stressed that subsection 1677a(d) specifically identifies the expenses Commerce should consider in arriving at CEP and, therefore, leaves no room for Commerce to exercise any discretion.

Commerce responds that it properly calculated Koyo's U.S. indirect selling expenses because the new statutory language does not define the types of expenses to be included

as U.S. indirect selling expenses and because its interpretation limiting such expenses to those incurred in the United States is reasonable. Moreover, Commerce maintains that the legislative history to which Timken points is not relevant and that the SAA supports Commerce's position. Def.'s Partial Opp'n to Mot. J. Agency R. at 18–21. At oral argument, Commerce added that its interpretation is bolstered by the definition of the term "United States expenses" in 19 U.S.C. § 1677a(f)(2)(B) as the "total expenses described in subsection d(1) and (2)." Commerce further reasoned that the expenses at issue were incurred in the United States to promote the sale to the first unaffiliated customer.

Koyo emphasizes that the statutory language and SAA support Commerce's change. In particular, Koyo points to the SAA's statement that, under subsection 1677a(d), CEP should only be reduced by the expenses and profit associated with economic activities occurring in the United States. Koyo's Opp'n to Mot. J. Agency R. at 10–14 (citing *SAA*, at 153).

The Court first notes that, although the statutory language has changed, neither the pre-URAA statute nor the newly-amended statute address whether U.S. indirect selling expenses incurred outside the United States should be categorized as U.S. indirect selling expenses. Rather, in limiting Koyo's U.S. indirect selling expenses to those incurred in the United States, Commerce has chosen to alter its treatment of such expenses. This change does not involve any prejudicial reliance on Commerce's previous methodology, as it is not related to a respondent's method of collecting and organizing data. Consequently, the issue for the Court is whether Commerce's interpretation of the newly-amended statute is reasonable. As no relevant case law exists and the statutory language does not specifically address this issue, the Court must examine the reasonableness of Commerce's interpretation in light of the legislative history and the SAA.

The legislative history specifically states that it intends subsection 1677a(d)(1)(D) to, "*as under the current practice,* encompass those expenses that do not result from, or cannot be tied directly to specific sales, but that may reasonably be attributed to such sales." S.Rep. No. 412, 103d Cong., 2d Sess. 65 (1994) (emphasis added). This language does not specifically state that selling expenses incurred in the home market should be included in U.S. indirect selling expenses. Rather, at most, it indicates that Congress did not intend Commerce to change substantially what it includes as such expenses.

Although the Court is concerned with Commerce's sudden change in practice, Commerce is afforded significant deference in its statutory interpretation. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Moreover, as Koyo notes, the SAA supports Commerce's position, as it explicitly states that

> [CEP] will be calculated by reducing the price of the first sale to an unaffiliated customer in the United States by the amount of the following expenses (and profit) associated with *economic activities occurring in the United States:* [listing the relevant expenses].

*SAA,* at 153 (emphasis added). Consequently, Commerce's decision to limit U.S. indirect selling expenses to those expenses incurred in the United States is supported by substantial evidence and fully in accordance with law.

3. *Adjustment to NV for Koyo's Home Market Billing Adjustments and Rebates*

■ In the Final Results, Commerce unequivocally stated that it now regards Koyo's billing adjustments and rebates, known as post-sale price adjustments ("PSPAs"), as direct adjustments to price, as opposed to selling expenses. 62 Fed.Reg. at 11,837. As a result, Commerce accepted Koyo's PSPAs, even though they were not reported on a transaction-specific basis and even though the allocations Koyo used included rebates on non-scope merchandise.[1] *Id.* Commerce

---

1. NV is defined as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country...." 19 U.S.C. § 1677b(a)(1)(B)(i) (1994). By allowing the adjustments at issue, Commerce interpreted the

emphasized that its change in practice stems from subsection 1677m(e), the post-URAA statutory provision that directs it to consider information that is less than perfect. *Id.* Commerce reasoned that, although it continues to prefer respondents to report such PSPAs on a transaction-specific basis (or, where a single adjustment is made on a group of sales, as a fixed and constant percentage of the value of such sales), it recognizes that this is not always feasible, especially given the large volume of transactions involved in TRB reviews. *Id.* Finally, Commerce noted that, pursuant to post-URAA requirements, it accepted these adjustments only after determining that: (1) it was not feasible for Koyo to report them on a transaction-specific basis; and (2) Koyo's allocation method did not cause unreasonable inaccuracies and distortions. *Id.*

Timken claims that Commerce's acceptance of Koyo's PSPAs is a complete departure from its well-established, court-approved stance to allow such adjustments only when they are reported on a transaction-specific and scope-specific basis. Timken's Mem. Supp. Mot. J. Agency R. at 24–37. In particular, Timken contends that Commerce's practice has been to allow a direct adjustment to foreign market value, the pre-URAA equivalent to NV, only for expenses that are tied directly to the sales on which they were incurred. *Id.* at 26–28 (citing *1992–93 TRB Final Results,* 61 Fed.Reg. at 57,640). Moreover, Timken maintains that subsection 1677m(e) is procedural in nature and, as such, has made no change to existing substantive law upholding such treatment. *Id.* at 24–26. Timken also points out that Commerce denied the Koyo adjustments at issue in the Preliminary Results. *Id.* at 27–28. Finally, Timken challenges Commerce's factual determination that Koyo's PSPA allocations were reasonably accurate and non-distortive. *Id.* at 33–36.

Timken stressed at oral argument that, even if subsection 1677m(e) allows Commerce to take less than perfect information into consideration, Koyo has not acted to the best of its ability to provide the necessary data in

Commerce's preferred form. Moreover, Timken points to the SAA requirement that Commerce take into account certain factors before accepting such information, including a respondent's: (1) size; (2) accounting systems; (3) computer capabilities; and (4) prior success in providing the requested information. *See SAA,* at 195.

Commerce responds that its decision was proper because subsection 1677m(e) directs Commerce to accept information that does not meet the agency's previous requirements. Def.'s Partial Opp'n to Mot. J. Agency R. at 21–31. At oral argument, Commerce reinforced this position, stating that it employed the institutional knowledge it has accumulated through years of Koyo verifications to determine that Koyo was incapable of providing data in Commerce's preferred form and that Koyo's information served as a reliable basis for making a determination.

Koyo agrees with Commerce's position, emphasizing that Commerce's new policy is not inconsistent with the statute or with relevant case law. Koyo's Opp'n to Mot. J. Agency R. at 14–26. Koyo stated at oral argument that the sheer volume of TRB transactions (approximately one million) prevented it from complying with Commerce's preferred form of response. Koyo added that the information Commerce requested was not necessary for Koyo's normal business operations and that to alter its computer database to comply with these requests would involve an enormous expense.

■ As a preliminary matter, the Court acknowledges that Commerce treated rebates and billing adjustments as selling expenses in preceding reviews under pre-URAA law. Moreover, this Court recognizes that it has previously decided that such adjustments are selling expenses and, therefore, should not be treated as adjustments to price. *See Koyo Seiko Co. v. United States,* 16 CIT 539, 542–43, 796 F.Supp. 1526, 1530 (1992). Nevertheless, this does not preclude Commerce's change in policy or this Court's reconsideration of its stance in light of the newly-amended antidumping statute.

term "price" in the NV definition as the price for the foreign like product after adjustments for

PSPAs, hence viewing the PSPAs as direct adjustments to price, as opposed to expenses.

The Court further notes that Timken's reliance on the 1992–93 TRB Final Results and on Commerce's denial of the PSPAs in the Preliminary Results is misplaced. First, the 1992–93 TRB Final Results determination was made under pre-URAA law. *See* 61 Fed.Reg. at 57,629 (stating that the results encompassed the review period of October 1, 1992, through September 31, 1993, long before the January 1, 1995, effective date for URAA amendments). Moreover, it is well-established that Commerce is not bound to its preliminary results position. *See, e.g., Peer Bearing Co. v. United States*, 22 CIT ——, ——, Slip Op. 98–70, at 20, 12 F.Supp.2d 445 (May 27, 1998); *Asociacion Colombiana de Exportadores de Flores v. United States*, 22 CIT ——, ——, Slip Op. 98–33, at 24–25, 6 F.Supp.2d 865, 879–80 (Mar. 25, 1998).

Neither the pre-URAA nor the newly-amended statutory language imposes standards establishing the circumstances under which Commerce is to grant or deny adjustments to NV for PSPAs. *See Torrington Co. v. United States*, 82 F.3d 1039, 1048 (Fed.Cir.1996) (dealing with pre-URAA law on PSPAs). However, subsection 1677m(e) specifically directs that Commerce shall not decline to consider an interested party's submitted information if that information is necessary to the determination but does not meet all of Commerce's established require-. ments, if the following criteria are met: (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by Commerce; and (5) the information can be used without undue difficulties.

First, the Court approves of Commerce's change in policy, as it substitutes a rigid rule with a more reasonable method that nonetheless ensures that a respondent's information is reliable and verifiable. This is especially true in light of the more lenient statutory instructions of subsection 1677m(e). The

Court further concludes that Commerce's decision to accept the PSPAs at issue is supported by substantial evidence and is fully in accordance with the post-URAA statutory language and the directions of the SAA. The record indicates that Commerce properly used its acquired knowledge of Koyo's computer systems and database to conclude that Koyo could not provide the information in the preferred form and, moreover, properly verified that Koyo's data was reliable. Commerce also properly accepted Koyo's allocation method, even though it included adjustments on scope and non-scope merchandise, as it carefully scrutinized the differences between such merchandise and ensured that it did not result in unreasonable distortions. Finally, while the Court acknowledges the potential for distorting reported per-unit adjustments on the sales involved in Commerce's analysis, the Court is convinced that Koyo cooperated to the best of its abilities in this case.

Consequently, the Court finds that Commerce's acceptance of Koyo's PSPAs as direct adjustments to NV is supported by substantial evidence and fully in accordance with law.

### 4. Clerical Errors

#### a. Commerce's Cost Test

Timken claims that Koyo made sales below cost that Commerce's computer program improperly did not exclude. Timken's Mem. Supp. Mot. J. Agency R. at 38–39. Commerce responds that it is immaterial that the computer program did not contain language to exclude below-cost sales because Commerce had already determined Koyo had made no such sales. Def.'s Partial Opp'n to Mot. J. Agency R. at 31–32 (citing to *Koyo Margin Program*, P.R. Doc. No. 128, at 12–13, lns. 381–420, Timken's App., Ex. 10 (Feb. 1, 1997)).

Timken now agrees that the computer program properly excluded sales below cost and, therefore, abandons this claim. Timken's Reply Mem. Supp. Mot. J. Agency R. at 19.

### b. *Model Matching Programming*

■ Timken contends that Commerce's computer program improperly matched U.S. sales to the next most similar home market model rather than to constructed value ("CV") where sales of the identical or most similar product in the home market were rejected because they were sold at prices below the cost of production ("COP"). Timken's Mem. Supp. Mot. J. Agency R. at 40–41.

Commerce acknowledges that an error exists in its programming language that causes certain U.S. sales to be matched with the second or third most-similar foreign like product in those instances where the identical or most similar foreign like product was determined to be below COP. Commerce, nevertheless, stated that a remand is not necessary because Commerce found that there were no below-cost sales with regard to Koyo. Def.'s Partial Opp'n to Mot. J. Agency R. at 33–34.

Koyo took no position on this issue in its opposition brief but thereafter argued that, pursuant to the CAFC's recent decision in *Cemex, S.A. v. United States,* 133 F.3d 897 (Fed.Cir.1998), a remand would not be appropriate. Letter from Peter O. Suchman, Counsel to Koyo, to Raymond E. Burghardt, Clerk of the Court (Mar. 20, 1998). In particular, Koyo states that *Cemex* appears to lead to the conclusion that when home market sales of identical merchandise are found to be below cost, Commerce should attempt to base NV on sales of similar merchandise rather than automatically resorting to CV. *Id.* at 2.

At oral argument, Commerce stated that it will attempt to match models with the next most similar models in the U.S. instead of CV, as *Cemex* requires, and pointed to a recent determination in which it explained its change in practice. *See Brass Sheet and Strip From Canada: Final Results of Antidumping Duty Administrative Review and Notice of Intent Not To Revoke Order in Part,* 63 Fed.Reg. 33,037, 33,038 (June 17, 1998) (stating that Commerce would use CV as the basis for NV only when there are no above-cost sales that are otherwise suitable for comparison). However, Commerce now requests a remand to ensure that NV was calculated in accordance with *Cemex.*

The Court agrees with Koyo's interpretation of *Cemex.* In that case, the CAFC reversed Commerce's practice of matching a U.S. sale to CV when the identical or most similar home market model failed the cost test. 133 F.3d at 904. The Court stated that "[t]he plain language of the statute requires Commerce to base [FMV] on nonidentical but similar merchandise . . . rather than [CV] when sales of identical merchandise have been found to be outside the ordinary course of trade." *Id.* As the URAA amended the definition of sales that are "outside the ordinary course of trade" to include sales at prices that are below cost, *see* 19 U.S.C. § 1677(15), if identical merchandise is found to be below cost, it is also outside the ordinary course of trade. Therefore, Commerce's computer program, albeit inadvertently, properly causes certain U.S. sales to be matched with the second or third most-similar foreign like product in those instances where the identical or most similar foreign like product was determined to be below COP, as mandated by *Cemex.* Nevertheless, this issue is remanded to Commerce to ensure that no models are erroneously matched to CV.

### c. *Setting of Certain Diameters in the Computer Program*

Timken alleges that instructions in Commerce's computer program for Koyo's margin set the home market TRB cup inner diameter and home market TRB cone outer diameter to zero before they were matched with U.S. models, but did not contain any instructions setting the same dimensions for U.S. models to zero. Timken's Mem. Supp. Mot. J. Agency R. at 39–40.

Commerce explains that Koyo sold individual TRB cups and cones in the U.S. market, as opposed to TRB sets. In the past, Commerce did not split U.S. sets into individual cup and cone sales and, therefore, it was not necessary to set the dimensions at issue to zero. However, as a result of Commerce's home market set-splitting methodology, through which Commerce derives separate cup and cone sales from the respondent's

reported home market TRB set sales, it is now necessary to purposely set the inner diameter for split cups and the outer diameter for split cones to zero. Hence, Commerce consents to a remand, noting that, if Koyo incorrectly reported an inner diameter value for any U.S. cups, or an outer diameter for any U.S. cones, that was greater than zero, the computer program would result in inaccurate model matching. Def.'s Partial Opp'n to Mot. J. Agency R. at 32–33.

Upon review of the record, the Court concludes that Commerce's computer program indeed failed to include language setting TRB cup inner diameter and TRB cone outer diameter dimensions to zero for U.S. model sales. *See Koyo Margin Program*, P.R. Doc. No. 128, at 11, lines 342–46. Consequently, the Court remands to Commerce to determine the extent to which Koyo reported any positive values for inside cup diameters and outside cone diameters in its sales of U.S. cups and cones and to correct the computer program by setting the value of any such positive diameters to zero in Koyo's U.S. summary sales database.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) determine the extent to which Koyo reported any positive values for inside cup diameters and outside cone diameters in its sales of U.S. cups and cones and to correct the computer program by setting the value of any such positive diameters to zero in Koyo's U.S. summary sales database; and (2) ensure that no models are erroneously matched to CV in accordance with *Cemex*. Commerce is sustained as to all other issues.

### ORDER

This case having been duly submitted for a decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to determine the extent to which Koyo reported any positive values for inside cup diameters and outside cone diameters in its sales of U.S. cups and cones and to correct the computer program by setting the value of any such positive diameters to zero in Koyo's U.S. summary sales database; and it is further

**ORDERED** that Commerce is to ensure that no models are erroneously matched to constructed value in accordance with *Cemex, S.A. v. United States*, 133 F.3d 897 (Fed.Cir. 1998); and it is further

**ORDERED** that Commerce is sustained as to all other issues; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date that the responses or comments are due.