**Slip Op. 00-102**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                          :
THE TORRINGTON COMPANY,                   :
                                          :
         Plaintiff,                       :
                                          :
         v.                               :   Court No. 99-08-00461
                                          :
UNITED STATES,                            :
                                          :
         Defendant,                       :
                                          :
SKF USA INC. and SKF GmbH;                :
FAG KUGELFISCHER GEORG SCHAFER AG          :
and FAG BEARINGS CORPORATION,             :
                                          :
         Defendant-Intervenors.           :
                                          :
_____ :

    Plaintiff, The Torrington Company ("Torrington"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews</u>, 64 Fed. Reg. 35,590 (July 1, 1999). Defendant-intervenors, SKF USA Inc. and SKF GmbH (collectively "SKF"), oppose Torrington's motion.

    Specifically, Torrington claims that Commerce erred in: (1) accepting direct price adjustments that were not tied to SKF's sales; (2) concluding that the adjustments were supported by substantial evidence and did not result in distortion; and (3) making two errors in the computer program that calculates SKF's dumping margins. SKF contends that: (1) Commerce acted lawfully in accepting SKF's allocated billing adjustment two as a direct adjustment to normal value; and (2) the adjustments were supported by substantial evidence. SKF takes no position on Torrington's allegation of clerical errors.

    **Held**: Torrington's USCIT 56.2 motion is denied in part and granted in part. This case is remanded to Commerce to correct the clerical errors in the computer program that calculates SKF's dumping margins.

Dated: August 18, 2000

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, William A. Fennell, Geert De Prest and Lane S. Hurewitz) for Torrington.

David W. Ogden, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Arthur D. Sidney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Steptoe & Johnson LLP (Herbert C. Shelley and Alice A. Kipel) for SKF.

Grunfeld, Desiderio, Lebowitz & Silverman LLP (Max F. Schutzman and Andrew B. Schroth) for Fag Kugelfischer Georg Schafer AG and Fag Bearings Corporation.


**OPINION**

**TSOUCALAS, Senior Judge:**  Plaintiff, The Torrington Company ("Torrington"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 64 Fed. Reg. 35,590 (July 1, 1999).  Defendant-intervenors, SKF USA Inc. and SKF GmbH (collectively "SKF"), oppose Torrington's motion.

Specifically, Torrington claims that Commerce erred in: (1)

accepting direct price adjustments that were not tied to SKF's sales; (2) concluding that the adjustments were supported by substantial evidence and did not result in distortion; and (3) making two errors in the computer program that calculates SKF's dumping margins. SKF contends that: (1) Commerce acted lawfully in accepting SKF's allocated billing adjustment two as a direct adjustment to normal value ("NV"); and (2) the adjustments were supported by substantial evidence. SKF takes no position on Torrington's allegation of clerical errors.

### BACKGROUND

This case concerns the ninth review of the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported to the United States from Germany during the review period of May 1, 1997 through April 30, 1998.[1] Commerce published the preliminary results of the subject review on February 23, 1999. See <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom;</u>

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995). <u>See</u> <u>Torrington Co. v. United States</u>, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

Preliminary Results of Antidumping Duty Administrative Reviews and Partial Recission of Administrative Reviews, 64 Fed. Reg. 8790. Commerce published the Final Results on July 1, 1999. See 64 Fed. Reg. at 35,590.

The Court granted FAG Kugelfischer Georg Schafer AG and FAG Bearings Corporation's (collectively "FAG") consent motion for a judicial protective order on October 10, 1999, after which FAG did not file any additional papers.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of America v. United States, 24 CIT ___, ___, Slip Op. 00-64, at 8-10 (June 5, 2000) (detailing Court's standard of review in antidumping proceedings).

## DISCUSSION

**I.   Commerce's Treatment of SKF's Home Market Billing Adjustments as Direct Price Adjustments to Normal Value**

### A.   Background

SKF's home market billing adjustment two ("BILLAD2") represents billing adjustments not associated with a specific transaction.  See SKF's Resp. Sec. B Questionnaire (Aug. 28, 1998) (Case No. A-428-801) at 26-28.  SKF explained that BILLAD2 included multiple invoices, multiple products or multiple product lines and could not be properly tied to a single transaction.  See id. at 26.  SKF, therefore, used customer-specific allocations to report these adjustments.  In reporting BILLAD2, SKF took the sum of all the adjustments for a particular customer number, divided the totals by total gross sales to that customer number and applied the resulting factor "to each reported sale made to that customer number by multiplying the per unit invoice price by the customer-specific billing adjustment factor for the relevant period."  Id. at 27.

Commerce accepted SKF's BILLAD2 as a direct adjustment to price after determining that SKF acted to the best of its ability in reporting the adjustment on a sale-specific basis and that its reporting methodology was "not unreasonably distortive."  Final Results, 64 Fed. Reg. at 35,603.  Commerce found that SKF's billing adjustments could not be tied to a single specific transaction since they were "part of credit or debit notes issued to the

customer that related to multiple invoices, products, or invoice lines," and that "the most feasible reporting methodology that SKF Germany could use was a customer-specific allocation, which is not unreasonably inaccurate or distortive." Id. Although it prefers transaction-specific reporting, Commerce realizes that such reporting is "not always feasible, particularly given the extremely large volume of transactions involved in these reviews and the time constraints imposed by the statutory deadlines." Id.

Furthermore, Commerce determined that SKF's methodology was "not unreasonably distortive" since there existed "no evidence on the record to indicate that the bearings included in SKF Germany's current allocations vary significantly, either in terms of value, physical characteristics, or the manner in which they were sold." Id. Commerce noted that it had verified the reasonableness of SKF's reporting methodology in the 1996-97 review. See id.

### B. Contentions of the Parties

Torrington argues that SFK failed to show that all reported billing adjustment number two values directly relate to the relevant sales. See Torrington's Mem. Support of Mot. J. Agency R. ("Torrington's Br.") at 2. Torrington maintains that the Court of Appeals for the Federal Circuit ("CAFC") has clearly defined "direct" adjustments to price as those that "vary with the

quantity sold, or that are related to a particular sale," and Commerce cannot treat adjustments that do not meet this definition as direct. Id. at 10 (citing Torrington Co. v. United States ("Torrington CAFC"), 82 F.3d 1039, 1050 (Fed. Cir. 1996) (citations omitted)). Torrington contends that here Commerce "redefined 'direct' to achieve what Torrington CAFC had previously disallowed" by allowing SKF to report allocated post-sale price adjustments ("PSPAs") if it acted to the best of its abilities in light of its record-keeping systems and the results were not unreasonably distortive. Id. at 12.

Furthermore, Torrington maintains that the amendments to the Uruguay Round Agreements Act ("URAA") did not modify the distinction between direct and indirect adjustments established under pre-URAA law such as Torrington CAFC. See id. at 13 (citing 19 U.S.C. § 1677a(d)(1)(B), (D) (1994) and § 1677b(a)(7)(B) (1994)). Torrington is not convinced that the Statement of Administrative Action [2] ("SAA") accompanying the URAA contradicts

---

[2] The Statement of Administrative Action ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Doc. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round

its contentions. See id. at 14 (citing SAA at 823-24). Additionally, Torrington acknowledges that the antidumping regulations that came into effect on July 1, 1997 apply to this review and maintains that they support its position. See id. at 14-15 (citing Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg. 27,296, 27,416-17 (May 19, 1997); Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 63 Fed. Reg. 35,188 (June 29, 1998)).

Torrington acknowledges that this Court has already approved of Commerce's practice as applied under post-URAA law in Timken Co. v. United States ("Timken"), 22 CIT ___, 16 F. Supp. 2d 1102 (1998), but asks the Court to reconsider its approval. See id. at 16. Torrington complains that Timken erroneously held that 19 U.S.C. § 1677m(e) (1994) shifts the burden of proof away from the party who stands to benefit from the claim made, here, SKF. See id.

Torrington also contends that even under its new methodology, Commerce's determination was not supported by substantial evidence inasmuch as SKF failed to show that (1) its reporting method did

---

Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

not result in distortion; and (2) it put forth its best efforts to report the information on a more precise basis. See id. at 2. Torrington emphasizes that SKF has the burden of showing non-distortion and best efforts, and having failed to do so, must not benefit from the adjustment. See id. at 22. Torrington, therefore, requests that this Court reverse Commerce's determination with respect to BILLAD2 and remand the case to Commerce with instructions to disallow SKF's downward home market billing adjustments, but allow all upward home market billing adjustments in calculating NV. See id. at 32.

Commerce responds that Torrington erred in relying on Torrington CAFC because the case does not stand for the proposition that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. See Def.'s Mem. in Partial Opp'n to Mot. J. Agency R. ("Def.'s Mem.") at 7. Rather, the Torrington CAFC court "merely overturned a prior Commerce practice . . . of treating certain allocated price adjustments as indirect expenses," id. (citing Torrington CAFC, 82 F.3d at 1047-51), and "does not address the propriety of the allocation methods" used in reporting the price adjustments in question, id. at 8 (quoting Final Results, 62 Fed. Reg. at 35,602). Also, contrary to Torrington's assertion, Commerce did not consider Torrington CAFC as addressing proper allocation methodologies; rather, Commerce,

only viewed <u>Torrington CAFC</u> as holding that "Commerce could not treat as indirect selling expenses 'improperly' allocated price adjustments." <u>Id.</u> at 9.  Commerce notes that pursuant to its new methodology, it does not consider price adjustments to be any type of selling expense, either direct or indirect, and, therefore, Torrington's argument is not only without support, but also inapposite to <u>Torrington CAFC</u>.  <u>See id.</u>  Moreover, Commerce asserts that this Court in <u>Timken</u> approved of Commerce's modified methodology of accepting respondents' claims for discounts, rebates and other billing adjustments as direct price adjustments, where this Court found the methodology to be consistent with requisites of 19 U.S.C. § 1677m(e).  <u>See id.</u> at 10-11 (citing <u>Timken</u>, 16 F. Supp. 2d at 1108).

Commerce also argues that its treatment of SKF's reported home market billing adjustments was supported by substantial record evidence and otherwise in accordance with law because it is consistent with <u>Timken</u>, that is, Commerce: (1) "used its acquired knowledge of the respondents' computer systems and databases to conclude that they could not provide the information in the preferred form"; and (2) "scrutinized the respondents' data before concluding that the data were reliable"; and (3) found "that the adjustments on scope and non-scope merchandise did not result in unreasonable distortions."  <u>Id.</u> at 19.

Additionally, Commerce argues that its findings are supported by substantial evidence. See id. at 20. Specifically, Commerce maintains that "SKF could not properly tie the note to a single transaction" and, therefore, properly calculated the adjustments on a customer-specific basis. Id. Commerce noted that it had "verified SKF's treatment of the adjustment and granted the adjustment as a direct adjustment to price during the sixth and eighth reviews of AFBs" and found that it was not unreasonably distortive, that is, SKF did not favor out-of-scope merchandise over in-scope merchandise. Id. at 21-22.

With respect to Torrington's argument that SKF did not carry the burden of proving its entitlement to the adjustment, Commerce responded that it does not require a party to "'prove a negative' or demonstrate what the amount of the expense or price adjustment would have been if transaction-specific reporting had been used." Id. at 22-23. Moreover, there was no reason to suspect any distortion or manipulation in the ninth review. See id. at 24. Commerce maintains that Torrington is mistaken in its contention that SKF failed to substantiate that it acted to the best of its ability to report the adjustment on a transaction-specific basis. See id. at 25. Specifically, Commerce argues that it would be unreasonable to expect SKF to modify its accounting system and generate more precise data when Commerce has made the "reasonable

determination that, given the large number of sales, and the manner in which the billing adjustment was granted, customer-specific allocations were reasonable." Id. at 25-26.

SKF concurs with Commerce's position. SKF contends that in Timken this Court properly stated that Commerce's pre-URAA treatment of allocated PSPAs "does not preclude the agency from changing its policy, nor does it preclude the Court from reconsidering, in view of the Uruguay Round amendments to the statute, its approval of Commerce's prior practice." SKF's Br. Response to Torrington's 56.2 Mot. J. Agency R. ("SKF's Br.") at 11. SKF also maintains that "[a]s a matter of law, this Court's reliance on 19 U.S.C. § 1677m(e) was correct and the same reasoning should continue to be applied in this case." Id. SKF contends that the holding of Torrington CAFC does not answer the issue in the instant case and, moreover, that case was decided under pre-URAA law. See id. at 18-19. Furthermore, SKF argues that subsequent changes in the law, that is, § 1677m(e) and the SAA, support its position and cannot be ignored. See id. at 20.

SKF also contends that substantial record evidence supports Commerce's conclusions. See id. at 30. SKF maintains that the record demonstrates that SKF has satisfied each of the requirements of § 1677m(e). See id. Moreover, Torrington only takes issue with respect to one of the requirements, specifically, that "'the

interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority . . . with respect to the information.'"  Id. at 30-31.  SKF responds to Torrington's contention by arguing that Commerce reasonably concluded that SKF acted to the best of its ability and that its methodology was not unreasonably distortive.  See id. at 31.

SKF contends that its inability to report the adjustments on a more specific basis results from the nature of the adjustment and, moreover, it would be unreasonable to expect SKF to alter its dealings with its customers to fit Torrington's conception of the antidumping reporting requirements.  See id. at 39.  Finally, SKF argues that the same methodology used in the subject review was used in previous reviews where no distortion was found and, furthermore, there is no evidence of distortion in the subject review.  See id. at 40.

### C.  Analysis

The Court notes that this issue has been decided in Torrington Co. v. United States ("Torrington CIT"), 24 CIT __, 100 F. Supp. 2d 1102 (2000), Timken and, most recently, NTN Bearing, 24 CIT at ___, Slip Op. 00-64, at 83-101.  The Court adheres to its previous decisions, applying the analysis in NTN Bearing to the instant

case.

The Court disagrees with Torrington that <u>Torrington CAFC</u> dictates that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. Rather, as Commerce correctly stated, the Court notes that <u>Torrington CAFC</u> "does not address the propriety of allocation methods but rather holds that [Commerce] may not treat direct price adjustments as if they were indirect selling expenses." <u>Final Results</u>, 64 Fed. Reg. at 35,602. The Court further notes that <u>Torrington CAFC</u> was decided under pre-URAA law, that is, it did not take into consideration the new statutory guidelines of 19 U.S.C. § 1677m(e). Moreover, the Court acknowledged in <u>Timken</u> that although (1) "Commerce treated rebates and billing adjustments as selling expenses in preceding reviews under pre-URAA law," and (2) "previously decided that such adjustments are selling expenses and, therefore, should not be treated as adjustments to price," the Court nevertheless determined that this did not "preclude Commerce's change in policy or this Court's reconsideration of its stance in light of the newly-amended antidumping statute [(that is, 19 U.S.C. § 1677m(e))]." 16 F. Supp. 2d at 1107.

Indeed, the Court approved in <u>Timken</u> Commerce's modified methodology of accepting claims for discounts, rebates and other billing adjustments as direct price adjustments to NV, <u>see id.</u> at

1107-08, and reaffirmed its decision in <u>Torrington CIT</u>. Specifically, in <u>Timken</u>, the Court reasoned that "[n]either the pre-URAA nor the newly-amended statutory language imposes standards establishing the circumstances under which Commerce is to grant or deny adjustments to NV for PSPAs." 16 F. Supp. 2d at 1108 (citing <u>Torrington CAFC</u>, 82 F.3d at 1048). The Court, however, noted that 19 U.S.C. § 1677m(e) "specifically directs that Commerce shall not decline to consider an interested party's submitted information if that information is necessary to the determination but does not meet all of Commerce's established requirements, if the [statute's] criteria are met." <u>Id.</u> The Court, therefore, approved of Commerce's change in methodology, "as it substitutes a rigid rule with a more reasonable method that nonetheless ensures that a respondent's information is reliable and verifiable. This is especially true in light of the more lenient statutory instructions of subsection 1677m(e)." <u>Id.</u>

Accordingly, the Court in <u>Timken</u> upheld Commerce's decision to accept Koyo's billing adjustments and rebates, "even though they were not reported on a transaction-specific basis and even though the allocations Koyo used included rebates on non-scope merchandise." <u>See id.</u> at 1106. Similarly, in <u>Torrington CIT</u>, the Court followed the rationale of <u>Timken</u> and upheld Commerce's determination to accept respondents' rebates even though they were

reported on a customer-specific rather than transaction-specific basis and even though the allocation methodology used included rebates on non-scope merchandise.  See 24 CIT at __, 100 F. Supp. 2d at 1107-08.

The Court finds that Commerce's decision to accept SKF's reported home market billing adjustments was supported by substantial evidence and was fully in accordance with the post-URAA statutory language and the SAA's statements.  The record clearly indicates that Commerce properly used its acquired knowledge of SKF's billing practices to conclude that it could not provide the information in the preferred form and, moreover, properly scrutinized SKF's reported billing adjustments before concluding that the adjustments were reliable.  See Final Results, 64 Fed. Reg. at 35,603.  Commerce also properly accepted SKF's allocation methodology even though the adjustments related to multiple invoices, products or product lines since there was no evidence "that the bearings included in . . . [the] allocation var[ied] significantly, either in terms of value, physical characteristics, or the manner in which they were sold," indicating that the allocations were not unreasonably distortive.  Id.

Moreover, the record and the Final Results demonstrate that the requirements of 19 U.S.C. § 1677m(e), as noted earlier, were satisfied by the respondents.  First, SKF's reported adjustments

were submitted in a timely fashion.  See § 1677m(e)(1).  Second, the information SKF submitted was verifiable, as shown in prior reviews that utilized the identical treatment of BILLAD2.  See § 1677m(e)(2).  Third, SKF's information was not so incomplete that it could not serve as a basis for reaching a determination.  See § 1677m(e)(3).  Fourth, SKF demonstrated that it acted to the best of its abilities in providing the information and meeting Commerce's new reporting requirements.  See § 1677m(e)(4).  Finally, the Court finds that there was no indication that the information was incapable of being used without undue difficulties.  See § 1677m(e)(5).

Commerce's determination with respect to SKF was also consistent with the SAA.  The Court agrees with Commerce's finding in the Final Results that given the extremely large volume of transactions and time constraints imposed by the statute, SKF's reporting and allocation methodologies were reasonable.  This is consistent with the SAA directive under § 1677m(e), which provides that Commerce "may take into account the circumstances of the party, including (but not limited to) the party's size, its accounting systems, and computer capabilities."  SAA at 865.  Thus, the Court finds that Commerce properly considered the ability of SKF to report BILLAD2 on a more specific basis.

Accordingly, the Court concludes that Commerce's acceptance of

SKF's reported billing adjustments as direct adjustments to NV is supported by substantial evidence and fully in accordance with law.

## II. Clerical Errors

Torrington contends that, contrary to Commerce's intent, the computer program used to calculate SKF's dumping margins erroneously failed to exclude further manufactured sales from the antidumping calculations. See Torrington's Br. at 28 (citing SKF's Preliminary Results Analysis Mem. (Feb. 18, 1999) (Case No. A-428-801) ("SKF's Preliminary") at 4). Torrington also contends that Commerce erred in failing to exclude sales made outside the period of review from the United States sales database. See Torrington's Reply Br. at 11. SKF takes no position on the alleged clerical errors. See SKF's Br. at 49.

Commerce agrees that it committed the errors alleged by Torrington. Specifically, Commerce maintains that in SKF's Preliminary it had "explained that the United States value added for ball bearings was likely to exceed substantially the value of the imported subject merchandise" and, therefore, Commerce declared that it was excluding sales of further-manufactured merchandise. Def.'s Br. at 30. Due to an error in the computer programming language that failed to include the proper definition of further-manufactured sales, these sales were not excluded from the margin

calculation. <u>See id.</u>  Commerce also admits that it failed to properly exclude SKF's sales made outside the period of review from the United States sales database.  <u>See id.</u>

The Court has reviewed the record and finds that Commerce did indeed commit the two errors specified in Torrington and Commerce's briefs.  <u>See</u> Torrington's Br. at 28-31; Def.'s Br. at 30.  The Court, therefore, remands this matter to Commerce to correct the errors.

## CONCLUSION

This case is remanded to Commerce to: (1) exclude SKF's further-manufactured sales from the margin calculation for constructed export price sales; (2) exclude SKF's sales made outside the review period from the United States sales database; and (3) recalculate SKF's dumping margins.  Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    August 18, 2000
          New York, New York