**Slip Op. 00-128**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

————————————————————————————— :
:
SKF USA INC., SKF FRANCE S.A. :
and SARMA, :
:
         Plaintiffs and :
         Defendant-Intervenors, :
:
      v. : Consol. Court No.
: 97-02-00269-S1
UNITED STATES, :
:
         Defendant, :
:
         and :
:
THE TORRINGTON COMPANY and :
SNR ROULEMENTS, :
:
         Defendant-Intervenors :
         and Plaintiffs. :
————————————————————————————— :

      Plaintiffs and defendant-intervenors, SKF USA Inc., SKF France S.A. and Sarma (collectively "SKF") move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews</u> ("Final Results"), 62 Fed. Reg. 2081 (Jan. 15, 1997), as amended, <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, and Singapore; Amended Final Results of Antidumping Duty Administrative Reviews</u>, 62 Fed. Reg. 14,391 (Mar. 26, 1997). Defendant-intervenors and plaintiffs, The Torrington Company ("Torrington") and SNR Roulements ("SNR") also move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of Commerce's <u>Final Results</u>.

      Specifically, SKF argues that Commerce erred in:

(1)calculating constructed value ("CV") profit; (2) calculating the CV home market credit expense rate based on home market gross unit price while applying that rate to the per unit cost of production; (3) including SKF's zero-value United States transactions in its margin calculations; (4) failing to match United States sales to similar home market sales prior to resorting to CV when all home market sales of identical merchandise have been disregarded; and (5) committing a computer error that resulted in the assignment of an incorrect level of trade ("LOT") code to certain United States sales.

Torrington contends that Commerce erred in accepting SKF's home-market billing adjustments because: (1) they were reported on a customer-specific rather than on a transaction-specific basis; and (2) the data is incomplete.

SNR argues that Commerce erred in: (1) calculating CV profit; and (2) deducting home market depreciation expenses as United States indirect selling expenses when calculating constructed export price ("CEP").

**Held:** SKF's USCIT R. 56.2 motion is denied in part and granted in part. Torrington's USCIT R. 56.2 motion is denied in part and granted in part. SNR's USCIT R. 56.2 motion is denied in part and granted in part. The case is remanded to Commerce to: (1) reconsider its decision to calculate SKF's home market credit expense based upon price and then apply that rate to cost; (2) exclude any transactions that were not supported by consideration from SKF's United States sales database and to adjust the dumping margins accordingly; (3) first attempt to match SKF's United States sales to similar home market sales before resorting to CV; (4) assign the correct LOT code for SKF's export price sales in the margin calculation program; (5) determine whether SKF-France's billing adjustment two is insignificant within the meaning of 19 U.S.C. § 1677f-1(a) (1994); and (6) reconsider the treatment of depreciation expenses incurred in France in calculating CEP for SNR. Commerce is affirmed in all other respects.

[SKF's motion is denied in part and granted in part. Torrington's motion is denied in part and granted in part. SNR's motion is denied in part and granted in part. Case remanded.]

Dated: October 11, 2000

Steptoe & Johnson LLP (Herbert C. Shelley and Alice A. Kipel) for SKF.

David W. Ogden, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Mark A. Barnett, Thomas H. Fine, Patrick V. Gallagher and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for Torrington.

Grunfeld, Desiderio, Lebowitz & Silverman LLP (Bruce M. Mitchell and Jeffrey S. Grimson) for SNR.


## OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs and defendant-intervenors, SKF USA Inc., SKF France S.A. and Sarma (collectively "SKF") move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 62 Fed. Reg. 2081 (Jan. 15, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany,

Italy, Japan, and Singapore; Amended Final Results of Antidumping Duty Administrative Reviews ("Amended Final Results"), 62 Fed. Reg. 14,391 (Mar. 26, 1997). Defendant-intervenors and plaintiffs, The Torrington Company ("Torrington") and SNR Roulements ("SNR") also move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of Commerce's Final Results.

Specifically, SKF argues that Commerce erred in: (1)calculating constructed value ("CV") profit; (2) calculating the CV home market credit expense rate based on home market gross unit price while applying that rate to the per unit cost of production ("COP"); (3) including SKF's zero-value United States transactions in its margin calculations; (4) failing to match United States sales to similar home market sales prior to resorting to CV when all home market sales of identical merchandise have been disregarded; and (5) committing a computer error that resulted in the assignment of an incorrect level of trade ("LOT") code to certain United States sales.

Torrington contends that Commerce erred in accepting SKF's home-market billing adjustments because: (1) they were reported on a customer-specific rather than on a transaction-specific basis; and (2) the data is incomplete.

SNR argues that Commerce erred in: (1) calculating CV profit; and (2) deducting home market depreciation expenses as United States indirect selling expenses when calculating constructed export price ("CEP").

**BACKGROUND**

This case concerns the sixth review of the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported to the United States from France during the review period of May 1, 1994 through April 30, 1995.[1] On July 8, 1996, Commerce published the preliminary results of the subject review. <u>See</u> <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Thailand and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Termination of Administrative Reviews, and Partial Termination of Administrative Reviews</u> ("<u>Preliminary Results</u>"), 61 Fed. Reg. 35,713. Commerce issued the <u>Final</u>

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995). <u>See</u> <u>Torrington Co. v. United States</u>, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

Results on January 15, 1997, see 62 Fed. Reg. 2081, and the

Amended Final Results on March 26, 1997, see 62 Fed. Reg.

14,391.


### JURISDICTION

The Court has jurisdiction over this matter pursuant to 19

U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).


### STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an

antidumping administrative review unless it is "unsupported by

substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see

NTN Bearing Corp. of America v. United States, 24 CIT ___, ___,

104 F. Supp. 2d 110, 115-16 (2000) (detailing Court's standard

of review in antidumping proceedings).


### DISCUSSION

**I.  Commerce's CV Profit Calculation**

**A.   Background**

For this POR, Commerce used CV as the basis for normal value

("NV") "when there were no usable sales of the foreign like

product in the comparison market." Preliminary Results, 61 Fed.

Reg. at 35,718. Commerce calculated the profit component of CV using the statutorily preferred methodology of 19 U.S.C. § 1677b(e)(2)(A) (1994). See Final Results, 62 Fed. Reg. at 2113. Specifically, in calculating CV, the statutorily preferred method is to calculate an amount for profit based on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . in connection with the production and sale of a foreign like product [made] in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(2)(A).

In applying the preferred methodology for calculating CV profit, Commerce determined that "the use of aggregate data that encompasses all foreign like products under consideration for NV represents a reasonable interpretation of [§ 1677b(e)(2)(A)] and results in a practical measure of profit that [Commerce] can apply consistently in each case." Final Results, 62 Fed. Reg at 2113. Also, in calculating CV profit under § 1677b(e)(2)(A), Commerce excluded below-cost sales from the calculation which it disregarded in the determination of NV pursuant to § 1677b(b)(1) (1994). See id. at 2114.

B.    Contentions of the Parties

SKF and SNR contend that Commerce's use of aggregate data encompassing all foreign like products under consideration for NV in calculating CV profit is contrary to § 1677b(e)(2)(A). See SKF's Br. Supp. Mot. J. Agency R. ("SKF's Br.") at 11-26; SNR's Br. Supp. Mot. J. Agency R. ("SNR's Br.") at 7-12. Instead, SKF and  SNR claim that Commerce should have relied on the alternative methodology of § 1677b(e)(2)(B)(i), which provides a CV profit calculation that is similar to the one Commerce used, but does not limit the calculation to sales made in the ordinary course of trade, that is, below-cost sales are not excluded from the calculation.  See SKF's Br. at 11-26; SNR's Br. at 12-13.   SKF also asserts that if Commerce's exclusion of below-cost sales from the numerator of the CV profit calculation is lawful, Commerce should nonetheless include such sales in the denominator of the calculation to temper bias which is inherent in the agency's dumping margin calculations.  See SKF's Br. at 26-30.

Commerce responds that it properly calculated CV profit pursuant to § 1677b(e)(2)(A) based on aggregate profit data of all foreign like products under consideration for NV.  See Def.'s Mem. in Partial Opp'n to Pls.' Mots. J. Agency R.

("Def.'s Mem.") at 8-11. Consequently, Commerce maintains that since it properly calculated CV profit under subparagraph (A) rather than (B) of § 1677b(e)(2), it correctly excluded below-cost sales from the CV profit calculation. See id. at 12-19. Torrington generally agrees with Commerce's contentions. See Torrington's Resp. to Pls.' Mots. J. Agency R. ("Torrington's Resp.") at 6-15.

### C.   Analysis

In RHP Bearings Ltd. v. United States, 23 CIT ___, 83 F. Supp. 2d 1322 (1999), this Court upheld Commerce's CV profit methodology of using aggregate data of all foreign like products under consideration for NV as being consistent with the antidumping statute. See id. at ___, 83 F. Supp. 2d at 1336. Since Commerce's CV profit methodology and SKF and SNR's arguments at issue in this case are practically identical to those presented in RHP Bearings, the Court adheres to its reasoning in RHP Bearings. The Court, therefore, finds that Commerce's CV profit methodology is in accordance with law.

Moreover, since (1) § 1677b(e)(2)(A) requires Commerce to use the actual amount for profit in connection with the production and sale of a foreign like product in the ordinary

course of trade, and (2) 19 U.S.C. § 1677(15) (1994) provides that below-cost sales disregarded under § 1677b(b)(1) are considered to be outside the ordinary course of trade, the Court finds that Commerce properly excluded below-cost sales from the CV profit calculation.

## II.  CV Home Market Credit Expense Rate

### A.    Contentions of the Parties

SKF contends that Commerce erred in "calculating a home market credit expense rate based on price, but applying that rate to cost."  See SKF's Br. at 30.  Specifically, Commerce "computed a credit expense rate based on the ratio of home market credit expense to home market gross unit price" when "calculating an average home market credit expense to be deducted from CV."  Id.  Commerce applied the home market credit expense rate to the COP, rather than price, of each model to derive a per unit amount for home market credit expense.  See id.  Commerce then deducted the per unit expense amount in the CV calculation.  See id.  SKF maintains that applying a home market credit expense rate based upon price to cost is contrary to the "fundamental principle inherent in all antidumping rate and factor calculations, that the calculation of the rate and its application must be consistent."  SKF's Reply Supp. Mot. J.

Agency R. ("SKF's Reply") at 21.

Commerce agrees that it erred "by calculating a home market credit expense based upon price but applying that rate to cost," and asks the Court to remand the matter for recalculation of SKF's home market credit cost. Def.'s Mem. at 26. Torrington, however, maintains that Commerce's methodology is reasonable and should be affirmed. See Torrington's Resp. at 26.

In light of the foregoing, the Court remands this issue to Commerce to reconsider its decision to calculate home market credit expense based upon price and then apply that rate to cost.

## III. Zero-Value United States Transactions

### A. Contentions of the Parties

SKF argues that in light of NSK Ltd. v. United States, 115 F.3d 965, 975 (Fed. Cir. 1997), the Court should remand the matter to Commerce to exclude SKF's zero-value transactions from its margin calculations. See SKF's Br. at 35-36. SKF maintains that United States transactions at zero value, such as prototypes and samples, do not constitute true sales and, therefore, should be excluded from the margin calculations

pursuant to NSK.  See id.  at 36.  The identical issue was decided by this Court in SKF USA Inc. v. United States, 23 CIT ___, Slip Op. 99-56, 1999 WL 486537 (June 29, 1999).

Torrington concedes that a remand may be necessary in light of NSK, but argues that further factual inquiry by Commerce is necessary to determine whether the zero-price transactions were truly without consideration.  See Torrington's Resp. at 28. Torrington argues that only if the transactions are truly without consideration can they fall within NSK's exclusion.  See id. at 12.

Commerce concedes that the case should be remanded to it to exclude the sample transactions for which SKF received no consideration from SKF's United States sales database.  See Def.'s Mem. at 26.

Commerce is required to impose antidumping duties upon merchandise that "is being, or is likely to be, sold in the United States at less than its fair value."  19 U.S.C. § 1673(1) (1994).  A zero-priced transaction does not qualify as a "sale" and, therefore, by definition cannot be included in Commerce's [foreign market value] calculation.  See NSK, 115 F.3d at 975 (holding "that the term sold . . . requires both a transfer of ownership to an unrelated party and consideration").  Thus, the

distribution of AFBs for no consideration falls outside the purview of 19 U.S.C. § 1673. Consequently, the Court remands to Commerce to exclude any transactions that were not supported by consideration from SKF's United States sales database and to adjust the dumping margins accordingly.

**IV.  Commerce's Matching United States Sales to Similar Home Market Sales Prior to Resorting to CV**

SKF maintains that Commerce erred in resorting to CV without first attempting to match United States sales, that is, export price ("EP") or CEP sales, to similar home market sales in instances where home market sales of identical merchandise have been disregarded because they were out of the ordinary course of trade.  See SKF's Br. at 38-39.  SKF maintains that a remand is necessary to bring Commerce's practice in line with the United States Court of Appeals for the Federal Circuit's ("CAFC") decision in Cemex, S.A. v. United States, 133 F.3d 897, 904 (Fed. Cir. 1998).  Commerce agrees with SKF.  See Def.'s Mem. at 27.

The Court agrees with SKF and Commerce.  In Cemex, the CAFC reversed Commerce's practice of matching a United States sale to CV when the identical or most similar home market model failed the cost test.  See 133 F.3d at 904.  The CAFC stated that

"[t]he plain language of the statute requires Commerce to base foreign market value [(now NV)] on nonidentical but similar merchandise [(foreign like product under the amendments to the Uruguay Round Agreements Act)] . . . rather than [CV] when sales of identical merchandise have been found to be outside the ordinary course of trade." Id. In light of Cemex, this matter is remanded so that Commerce can first attempt to match United States sales to similar home market sales before resorting to CV.


## V. Commerce's Computer Error

### A. Contentions of the Parties

SKF argues that Commerce assigned sales to large industrial users an LOT code "2," but then incorrectly coded the EP sales made by SKF France under an LOT code "3" in the Final Results and Amended Final Results. See SKF's Br. at 40.

Commerce reviewed SKF's allegation and agrees that certain EP sales were erroneously coded as to their LOT. See Def.'s Mem. at 28. Commerce asks the Court to remand the case so that Commerce can assign the correct LOT code for SKF's EP sales in the margin calculation program. See id. Torrington takes no position on this issue. See Torrington's Resp. at 4.

Upon review of the record, the Court agrees with SKF and Commerce that the EP sales made by SKF France were incorrectly coded. The Court, therefore, remands this issue to Commerce to assign the correct LOT code for SKF's EP sales in the margin calculation program.

**VI. Commerce's Treatment of SKF's Home Market Billing Adjustments as Direct Price Adjustments to NV**

**A.   Background**

SKF reported home market billing adjustment two ("BILLAD2") for sales made by its Austrian affiliate, Steyr Walzlager, in the home market of France. See SKF's Resp. Sec. B Questionnaire (Sept. 26, 1995) (Case No. A-427-801) at B-2. BILLAD2 represents billing adjustments not associated with a specific transaction. See id. at B-25 to B-26. SKF explained that BILLAD2 included multiple invoices, multiple products or multiple product lines and could not be properly tied to a single transaction. See id. SKF, therefore, used customer-specific allocations to report these adjustments. In reporting BILLAD2, SKF took the sum of all the adjustments for a particular customer number, divided the totals by total gross sales to that customer number and applied the resulting factor "to each reported sale made to that customer number by

multiplying the per unit invoice price by the customer-specific billing adjustment factor for the relevant period." Id.

Commerce accepted SKF's BILLAD2 as a direct adjustment to price after determining that SKF acted to the best of its ability in reporting the adjustment on a sale-specific basis and that its reporting methodology was "not unreasonably distortive." Final Results, 62 Fed. Reg. at 2090. Commerce found that SKF's billing adjustments could not be tied to a single specific transaction because they "relate to multiple invoices or multiple invoice lines." Id. at 2095. Although it prefers transaction-specific reporting, Commerce realizes that such reporting is not always feasible, particularly given the "non-transaction-specific nature of the expense, the volume of [home market] transactions reported by SKF, and the time constraints imposed by the statutory deadlines." Id.

Furthermore, Commerce determined that even though SKF included out-of-scope merchandise in the allocation of the adjustment, the methodology was "not unreasonably distortive" since there existed "no reason to believe that such adjustments were not granted in proportionate amounts with respect to sales of out-of-scope and in-scope merchandise." Id.

**B.    Contentions of the Parties**

Torrington argues that SFK failed to show that all reported BILLAD2 values directly relate to the relevant sales.  See Torrington's Br. at 5.  Torrington maintains that the CAFC has clearly defined "direct" adjustments to price as those that "vary with the  quantity sold, or that are related to a particular sale," and Commerce cannot treat adjustments that do not meet this definition as direct.  Id. at 11 (citing Torrington Co. v. United States ("Torrington CAFC"), 82 F.3d 1039, 1050 (Fed. Cir. 1996) (citations omitted)).  Torrington contends that here Commerce "redefined 'direct' to achieve what Torrington CAFC had previously disallowed" by allowing SKF to report allocated post-sale price adjustments ("PSPAs") if it acted to the best of its abilities in light of its record-keeping systems and the results were not unreasonably distortive.  Id. at 13.

Furthermore, Torrington maintains that the amendments to the Uruguay Round Agreements Act ("URAA") did not modify the distinction between direct and indirect adjustments established under pre-URAA law such as Torrington CAFC.  See id. at 14 (citing 19 U.S.C. § 1677a(d)(1)(B), (D) (1994) and § 1677b(a)(7)(B) (1994)).  Torrington is not convinced that the

Statement of Administrative Action[2] ("SAA") accompanying the URAA contradicts its contentions.  See id. at 15 (citing SAA at 823-24).  Additionally, Torrington acknowledges that the antidumping regulations that came into effect on July 1, 1997 do not apply to this review but maintains that they support its position.  See id. at 15-16 (citing Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg. 27,296, 27,416-17 (May 19, 1997)).

Torrington acknowledges that this Court has already approved of Commerce's practice as applied under post-URAA law in Timken Co. v. United States ("Timken"), 22 CIT ___, 16 F. Supp. 2d 1102 (1998), but asks the Court to reconsider its approval.  See Torrington's Reply in Supp. Mot. J. Agency R. ("Torrington's Reply") at 6-7.  Torrington complains that Timken erroneously

---

[2] The Statement of Administrative Action ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  H.R. Doc. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.  "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

held that 19 U.S.C. § 1677m(e) (1994) shifts the burden of proof away from the party who stands to benefit from the claim made, here, SKF. See id.

Torrington also contends that even under its new methodology, Commerce's determination was not supported by substantial evidence inasmuch as SKF failed to show that (1) its reporting method did not result in distortion; and (2) it put forth its best efforts to report the information on a more precise basis. See Torrington's Br. at 21. Torrington emphasizes that SKF has the burden of showing non-distortion and best efforts, and having failed to do so, must not benefit from the adjustment. See id. at 21-22. Torrington, therefore, requests that this Court reverse Commerce's determination with respect to BILLAD2 and remand the case to Commerce with instructions to disallow SKF's downward home market billing adjustments, but allow all upward home market billing adjustments in calculating NV. See id. at 27.

Commerce responds that Torrington erred in relying on Torrington CAFC because the case does not stand for the proposition that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. See Def.'s Mem. at 42. Rather, the Torrington CAFC court "merely

overturned a prior Commerce practice . . . of treat[ing] certain allocated price adjustments as indirect expenses," id. at 42-43 (citing Torrington CAFC, 82 F.3d at 1047-51), and does "not address the propriety of the allocation methods" used in reporting the price adjustments in question, id. at 43 (quoting Final Results, 62 Fed. Reg. at 2091). Also, contrary to Torrington's assertion, Commerce did not consider Torrington CAFC as addressing proper allocation methodologies; rather, Commerce, only viewed Torrington CAFC as holding that "Commerce could not treat as indirect selling expenses 'improperly' allocated price adjustments." Id. at 44. Commerce notes that pursuant to its new methodology, it does not consider price adjustments to be any type of selling expense, either direct or indirect, and, therefore, Torrington's argument is not only without support, but also inapposite to Torrington CAFC. See id. at 45. Moreover, Commerce asserts that this Court in Timken approved of Commerce's modified methodology of accepting respondents' claims for discounts, rebates and other billing adjustments as direct price adjustments, where this Court found the methodology to be consistent with requisites of 19 U.S.C. § 1677m(e). See id. at 45-46 (citing Timken, 16 F. Supp. 2d at 1108).

Commerce also argues that its treatment of SKF's reported home market billing adjustments was supported by substantial record evidence and otherwise in accordance with law because it is consistent with <u>Timken</u>, that is, Commerce: (1) "used its acquired knowledge of the respondents' computer systems and databases to conclude that information . . . could not be provided in the preferred form"; and (2) "scrutinized the respondents' data before concluding that the data were reliable"; and (3) found "that the adjustments on scope and non-scope merchandise did not result in unreasonable distortions." <u>Id.</u> at 48.

Additionally, Commerce argues that its findings are supported by substantial evidence. <u>See id.</u> at 47. Specifically, Commerce maintains that SKF "had reported the adjustment on the most specific basis possible and, thus, had cooperated to the best of its ability." <u>Id.</u> at 48. Commerce noted that "given the similarity between the value, physical characteristics and manner of sales between SKF's in-scope and out-of-scope merchandise, Commerce found no evidence which would lead it to suspect" that the allocation methodology was unreasonably distortive, that is, SKF did not favor out-of-scope merchandise over in-scope merchandise. <u>Id.</u> at 48-49.

Commerce maintains that Torrington is mistaken in its contention that SKF failed to substantiate that it acted to the best of its ability to report the adjustment on a transaction-specific basis. See id. at 50-51. Commerce noted that the adjustment related to an "extremely small volume of merchandise and to very few customers." Id. at 49 (citing SKF's Resp. Sec. B Questionnaire (Sept. 26, 1995) (Case No. A-427-801)). For example, in 1994, SKF's total reported BILLAD2 totaled approximately $1,133.00, and in 1995, it amounted to $69.00, while the total sales of subject merchandise for the period of review was approximately $65,000,000.00. See id. at 49-50 (citing SKF's Resp. Sec. A Questionnaire (Sept. 26, 1995) (Case No. A-427-801)). Commerce argues that "[g]iven the insignificance of this adjustment in light of the enormous size of SKF's home market database, Commerce was more than reasonable in concluding that SKF acted to the best of its ability in allocating this adjustment" on a customer-specific basis "rather than seeking to trace specific invoices or groups of invoices." Id. at 50.

SKF concurs with Commerce's position. SKF contends that in Timken this Court properly stated that "'[n]either the pre-URAA nor the newly-amended statutory language imposes standards

establishing the circumstances under which Commerce is to grant or deny adjustments to NV for PSPAs.'" SKF's Resp. Torrington's Mot. J. Agency R. ("SKF's Resp.") at 17. SKF contends that the holding of <u>Torrington CAFC</u> does not answer the issue in the instant case and, moreover, that case was decided under pre-URAA law. <u>See id.</u> at 6. Furthermore, SKF argues that subsequent changes in the law, that is, § 1677m(e) and the SAA, support its position and cannot be ignored. <u>See id.</u> at 14-16.

SKF also contends that substantial record evidence supports Commerce's conclusions. <u>See id.</u> at 19. SKF maintains that the record demonstrates that Commerce had extensive knowledge and experience with BILLAD2 and properly drew on its knowledge in accepting SKF's methodology. <u>See id.</u> at 20. With respect to Torrington's argument that SKF failed to demonstrate that it acted to the best of its ability in providing the information in the preferred form, SKF responds by arguing that Commerce "has determined that, by their nature, these adjustments cannot be reported more specifically." <u>Id.</u> at 20-21.

SKF contends that its inability to report the adjustments on a more specific basis results from the nature of the adjustment and, moreover, it would be unreasonable to expect SKF

to alter its dealings with its customers to fit Torrington's conception of the antidumping reporting requirements. <u>See id.</u> at 21. Finally, SKF argues that the same methodology used in the subject review was used in other reviews where no distortion was found and, furthermore, there is no evidence of distortion in the subject review. <u>See id.</u> at 22-23.

### C.   Analysis

The Court notes that this issue has been decided in <u>Torrington Co. v. United States</u> ("<u>Torrington CIT</u>"), 24 CIT ___, 100 F. Supp. 2d 1102 (2000), <u>Timken</u> and, most recently, <u>NTN Bearing</u>, 24 CIT at ___, 104 F. Supp. 2d at 149-57. The Court adheres to its previous decisions, applying the analysis in <u>NTN Bearing</u> to the instant case.

The Court disagrees with Torrington that <u>Torrington CAFC</u> dictates that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. Rather, as Commerce correctly stated, the Court notes that <u>Torrington CAFC</u> does "not address the propriety of allocation methods" but rather holds that Commerce may not treat direct price adjustments as if they were indirect selling expenses. <u>Final Results</u>, 62 Fed. Reg. 2091. The Court further notes that

Torrington CAFC was decided under pre-URAA law, that is, it did not take into consideration the new statutory guidelines of 19 U.S.C. § 1677m(e).  Moreover, the Court acknowledged in Timken that although (1) "Commerce treated rebates and billing adjustments as selling expenses in preceding reviews under pre-URAA law," and (2) "previously decided that such adjustments are selling expenses and, therefore, should not be treated as adjustments to price," the Court nevertheless determined that this did not "preclude Commerce's change in policy or this Court's reconsideration of its stance in light of the newly-amended antidumping statute [(that is, 19 U.S.C. § 1677m(e))]." 16 F. Supp. 2d at 1107.

Indeed, the Court approved in Timken Commerce's modified methodology of accepting claims for discounts, rebates and other billing adjustments as direct price adjustments to NV, see id. at 1107-08, and reaffirmed its decision in Torrington CIT. Specifically, in Timken, the Court reasoned that "[n]either the pre-URAA nor the newly-amended statutory language imposes standards establishing the circumstances under which Commerce is to grant or deny adjustments to NV for PSPAs."  16 F. Supp. 2d at 1108 (citing Torrington CAFC, 82 F.3d at 1048).  The Court, however, noted that 19 U.S.C. § 1677m(e) "specifically directs

that Commerce shall not decline to consider an interested party's submitted information if that information is necessary to the determination but does not meet all of Commerce's established requirements, if the [statute's] criteria are met." Id. The Court, therefore, approved of Commerce's change in methodology, "as it substitutes a rigid rule with a more reasonable method that nonetheless ensures that a respondent's information is reliable and verifiable. This is especially true in light of the more lenient statutory instructions of subsection 1677m(e)." Id.

Accordingly, the Court in Timken upheld Commerce's decision to accept Koyo's billing adjustments and rebates, "even though they were not reported on a transaction-specific basis and even though the allocations Koyo used included rebates on non-scope merchandise." See id. at 1106. Similarly, in Torrington CIT, the Court followed the rationale of Timken and upheld Commerce's determination to accept respondents' rebates even though they were reported on a customer-specific rather than transaction-specific basis and even though the allocation methodology used included rebates on non-scope merchandise. See 24 CIT at __, 100 F. Supp. 2d at 1107-08.

The Court finds that Commerce's decision to accept SKF's reported home market billing adjustments was supported by substantial evidence and was fully in accordance with the post-URAA statutory language and the SAA's statements. The record indicates that Commerce properly used its acquired knowledge of SKF's billing practices to conclude that it could not provide the information in the preferred form and, moreover, properly scrutinized SKF's reported billing adjustments before concluding that the adjustments were reliable. See Final Results, 62 Fed. Reg. at 2095. Commerce also properly accepted SKF's allocation methodology even though the adjustments related to multiple invoices, products or product lines since there was no evidence "that such adjustments were not granted in proportionate amounts with respect to sales of out-of-scope and in-scope merchandise," indicating that the allocations were not unreasonably distortive. Id.

Moreover, the record and the Final Results demonstrate that the requirements of 19 U.S.C. § 1677m(e), as noted earlier, were satisfied by the respondents. First, SKF's reported adjustments were submitted in a timely fashion. See § 1677m(e)(1). Second, the information SKF submitted was verifiable, as shown in other reviews that utilized the identical treatment of BILLAD2. See

§ 1677m(e)(2). Third, SKF's information was not so incomplete that it could not serve as a basis for reaching a determination. See § 1677m(e)(3). Fourth, SKF demonstrated that it acted to the best of its abilities in providing the information and meeting Commerce's new reporting requirements. See § 1677m(e)(4). Finally, the Court finds that there was no indication that the information was incapable of being used without undue difficulties. See § 1677m(e)(5).

Commerce's determination with respect to SKF was also consistent with the SAA. The Court agrees with Commerce's finding in the Final Results that given the non-transaction-specific nature of BILLAD2, the extremely large volume of transactions and the time constraints imposed by the statute, SKF's reporting and allocation methodologies were reasonable. This is consistent with the SAA directive under § 1677m(e), which provides that Commerce "may take into account the circumstances of the party, including (but not limited to) the party's size, its accounting systems, and computer capabilities." SAA at 865. Thus, the Court finds that Commerce properly considered the ability of SKF to report BILLAD2 on a more specific basis.

Accordingly, the Court concludes that Commerce's acceptance

of SKF's reported billing adjustments as direct adjustments to NV is supported by substantial evidence and fully in accordance with law.

## VII. Commerce's Treatment of Home Market Billing Adjustments With Respect to Sales Made by SKF-France

### A.    Background and contentions of the parties

SKF designated as billing adjustment one those billing adjustments "greater than five percent of the gross unit price of the sale on which they were granted" or those "greater than [1,000 French Francs ("FF")] (about $167.00), whichever was less.   Def.'s Mem. at 51 (citing SKF's Resp. Sec. B Questionnaire (Sept. 26, 1995) (Case No. A-427-801) at B-23, B-24).  These adjustments were reported on a transaction-specific basis and, therefore, are not challenged by Torrington.

SKF designated as billing adjustment two those billing adjustments that were "less than FF 1,000 and were less than five percent of the value of the sale on which they were granted." Id.  Because SKF found these adjustments comprised a very small part of its overall home market sales of subject merchandise, SKF simply reported them as zero.  See SKF's Supplemental Resp. (Feb. 16, 1996) (Case No. A-427-801) at 36-37.  SKF further maintained that its failure to report the

actual amounts of the billing adjustment was detrimental to its own interest, as the total value of the adjustments would have increased NV and its dumping margin as well.  See id.

In the Final Results, Commerce accepted SKF's practice of disregarding insignificant billing adjustment values.  See 62 Fed. Reg. at 2095.  Specifically, Commerce determined that "[t]here is nothing on the record to suggest that SKF's information is inaccurate" and, furthermore, "[t]his policy of disregarding insignificant adjustments is consistent with [Commerce's] policy in prior reviews."  Id.

Commerce notes that although it had previously disapproved of SKF taking upon itself the determination of whether billing adjustments are insignificant, it permitted the practice in the fourth review "because independent information gathered at verification confirmed that the overall adjustments lowered [foreign market value] and their omission was against SKF-France's interests."  See Def.'s Mem. at 52 (citing Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders ("fourth review"), 60 Fed. Reg. 10,900 (Feb. 28, 1995)).  In its

memorandum to the Court, however, Commerce argued contrary to its position in the <u>Final Results</u>, maintaining that the issue should be remanded for re-evaluation of its treatment of SKF's billing adjustment two. <u>See id.</u> at 51. Specifically, Commerce maintains that in the instant review, "SKF did not provide the necessary information to support its calculation of the relative size of the adjustments at issue and to permit Commerce to determine whether the insignificant adjustment provision, 19 C.F.R. § 353.59 (a), which authorizes Commerce to disregard insignificant adjustments, was applicable." <u>Id.</u> at 53. Commerce asks the issue to be remanded for SKF to support its calculation of the relative size of billing adjustment two so that Commerce may determine whether it is insignificant within the meaning of the applicable regulation, 19 C.F.R. § 353.59 (a) or for SKF to support its contention that the effect of billing adjustment two was a reduction of NV. <u>See id.</u>

Torrington concurs with Commerce's position. Torrington maintains SKF failed to substantiate its claim that the value of billing adjustment two was insignificant. <u>See</u> Torrington's Br. at 20. Additionally, Torrington maintains that the total net value of the adjustment is irrelevant as billing adjustments are invoice-specific and, therefore, can either increase or decrease

the reported price of any home market price and affect nominal value. See id. Torrington claims "Commerce erred by relying on SKF's representations rather than basing its determination on record evidence" and, therefore, Commerce's determination was not supported by substantial evidence. Id. at 25.

SKF maintains that Commerce's decision in the Final Results is supported by substantial evidence. SKF notes that the identical methodology employed in the instant review was accepted in the fourth review where Commerce had specifically stated that it did not merely allow SKF to determine what constituted an insignificant adjustment, but had verified the adjustment. See SKF's Resp. at 34-35. SKF argues that in the instant review, it did not merely assert that certain billing adjustments were insignificant, but provided Commerce with specific calculations. See SKF's Resp. at 35 (citing SKF's Supplemental Resp. (Feb. 16, 1996) (Case No. A-427-801) at 36-37).

### C. Analysis

In determining the EP (or CEP) under 19 U.S.C. § 1677a or NV under § 1677b, Commerce has the discretion to "decline to take into account adjustments which are insignificant in

relation to the price or value of the merchandise." 19 U.S.C. § 1677f-1(a)(2) (1994). Thus, the statute plainly provides not only that Commerce is the appropriate authority to determine whether an adjustment is insignificant, but also that Commerce has the discretion to decide whether to disregard an insignificant adjustment.

SKF maintains Commerce properly determined that its calculation of the billing adjustment was supported by substantial evidence by accepting SKF's conclusion that such values were insignificant or would have resulted in a net reduction of NV. The Court, however, disagrees with SKF that Commerce's decision is supported by substantial evidence since the only data that SKF had provided to Commerce in the administrative proceedings is the following:

> Specifically, in this review, . . . [SKF France's billing adjustment 2] represented only [    ] in 1994 and [    ] in January-April 1995 of the total gross sales value for SKF France. Furthermore, not reporting these billing adjustments was detrimental to SKF France, as the total net value of billing adjustments would have decreased foreign market value. Under its regulations, [Commerce] may disregard as insignificant an adjustment which would have an ad valorem effect of less than 0.33%. 19 C.F.R. § 353.59(a). Thus, SKF France's unreported billing adjustments may properly be considered insignificant, and in fact de minimis under [Commerce's] regulations.

SKF's Supplemental Resp. (Feb. 16, 1996) (Case No. A-427-801) at

36. Thus, SKF merely concluded that billing adjustment two comprised a certain percentage of total gross sales value, but did not provide the underlying information to Commerce for it to determine whether the adjustment was indeed insignificant. Alternatively, SKF provided no information to support its contention that the total effect of the billing adjustment was a reduction of NV. SKF's failure to provide this information, therefore, renders Commerce's determination in the Final Results unsupported by substantial evidence.

SKF offers to this Court a worksheet entitled "SKF France Billing Adjustments Not Processed Analysis" that it claims to have prepared concurrently with its supplemental response to Commerce's questionnaire and maintains this information supports its conclusions. SKF's Reply at 28, Ex. 9. SKF concedes, however, that this information was never submitted to Commerce. See id. Commerce did not have this information before it when it made its determination and, therefore, could not have relied on it when it concluded that SKF's calculations were proper. This Court cannot uphold Commerce's January 15th, 1997 determination on the basis of information upon which Commerce did not rely, since it is well-settled case law that "[t]he scope of the record for purposes of judicial review is based

upon information which was 'before the relevant decision-maker' and was presented and considered 'at the time the decision was rendered.'"  Beker Indus. Corp. v. United States, 7 CIT 313, 315, 1984 WL 3727 (1984) (citing S. Rep. No. 96-249, 96th Cong., 1st Sess. 247-48 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 633-34); Daido Corp. v. United States, 18 CIT 1053, 1059-60, 869 F. Supp. 967, 973 (1994);  Neuweg Fertigung GmbH v. United States, 16 CIT 724, 726-27, 797 F. Supp. 1020, 1022 (1992).  Commerce did not have the opportunity to evaluate the information to determine whether it provided adequate support for SKF's calculations, and the Court will not usurp Commerce's function in this regard.

Accordingly, the Court remands this issue to Commerce to determine whether billing adjustment two is insignificant within the meaning of 19 U.S.C. § 1677f-1(a).  Commerce is directed to consider whether the use of facts available pursuant to 19 U.S.C. § 1677e (1994) is warranted and must also consider its responsibilities under § 1677m(e).

**VIII. Deducting Home Market Depreciation Expenses as United States Indirect Selling Expenses When Calculating CEP**

**A.   Contentions of the Parties**

SNR contends that during verification, Commerce erred in

deducting from CEP home market depreciation expenses as United States indirect selling expenses after determining that "'SNR had allocated depreciation expenses to all sales but, in fact, [SNR] did not include them in the [indirect selling expense variable].'" SNR's Br. at 15 (quoting <u>Final Results</u>, 62 Fed. Reg. at 2105). SNR claims that there is "no basis for deducting the depreciation expense for office equipment" associated with the commercial department in France responsible for sales to subsidiaries since those expenses are not "'associated with economic activities in the United States.'" <u>See</u> SNR's Br. at 15-16.

SNR maintains that "the record shows that the depreciation expense attributable to subsidiary sales would have been an [indirect] export selling expense" and should have been disregarded as were the other indirect selling expenses. <u>Id.</u> at 17. SNR admits that the portion of the depreciation expenses allocated to its United States sales to its United States affiliate should have been reported in the variable designating indirect selling expenses primarily composed of "personnel costs and commission paid on sales made to all SNR subsidiaries." <u>See</u> SNR's Br. at 13-15 (quoting SNR's Resp. Sec. C Questionnaire (Sept. 26, 1995) (Case No. A-427-801) at 34-35).

Torrington maintains that Commerce reasonably added an amount for depreciation to the United States indirect selling expenses reported by SNR. See Torrington's Resp. at 15. Torrington argues that in the Final Results, Commerce properly deducted depreciation expenses incurred in France from CEP pursuant to 19 U.S.C. § 1677a(d)(1). See id. at 16. Torrington claims that under the statutory provision and proposed regulation, Commerce is required to deduct all expenses associated with economic activities in the United States, no matter where the expense was incurred. See id. Thus, Torrington argues that although the expense was incurred in France, it was properly deducted from CEP since some portion was allocable to SNR's United States sales. See id. at 17.

Commerce contends that the record is unclear on this issue and, therefore, "the case should be remanded to Commerce for reconsideration of the treatment of depreciation expenses incurred in France in calculating CEP for SNR." Def.'s Mem. at 54. In its reply to Commerce, SNR agreed that the Court should "remand the issue to allow Commerce to determine if it was appropriate to deduct from CEP depreciation expenses related to activities in the home market." SNR's Reply Br. Supp. Mot. J. Agency R. at 10.

### B.    Analysis

In the <u>Final Results</u>, Commerce simply stated the following:

> We agree with Torrington that SNR's depreciation expenses allocated to its [United States] sales should be part of [indirect selling expenses] we deduct from CEP.  We verified SNR's response and, based on our findings at verification, we have made this deduction for our final results.

62 Fed. Reg. at 2105.  Commerce did not state the basis for its conclusion that it was appropriate to deduct from CEP depreciation expenses related to activities in France.  The Court cannot uphold Commerce's determination when the basis for the decision is entirely unclear.[3]  The Court, therefore, remands this matter to Commerce to reconsider the treatment of depreciation expenses incurred in France in calculating CEP for

---

[3] Indeed, the Supreme Court has opined:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.  It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'

<u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196-97 (1947) (quoting <u>United States v. Chicago, M., St. P. & P.R. Co.</u>, 294 U.S. 499, 511 (1935)).

SNR.

**CONCLUSION**

The Court remands this case to Commerce to: (1) reconsider its decision to calculate SKF's home market credit expense based upon price and then apply that rate to cost; (2) exclude any transactions that were not supported by consideration from SKF's United States sales database and to adjust the dumping margins accordingly; (3) first attempt to match SKF's United States sales to similar home market sales before resorting to CV; (4) assign the correct LOT code for SKF's EP sales in the margin calculation program; (5) determine whether SKF-France's billing adjustment two is insignificant within the meaning of 19 U.S.C. § 1677f-1(a); and (6) reconsider the treatment of depreciation expenses incurred in France in calculating CEP for SNR. Commerce is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     October 11, 2000
           New York, New York